## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| ZWICK PARTNERS, LP and APARNA RAO, Individually and On Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>  v.<br><br>QUORUM HEALTH CORPORATION, COMMUNITY HEALTH SYSTEMS, INC., WAYNE T. SMITH, W. LARRY CASH, THOMAS D. MILLER, and MICHAEL J. CULOTTA,<br><br>      Defendants. | **Case No. 3:16-cv-02475**<br><br>**CLASS ACTION**<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |

## TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ..................................................................................1

II.     JURISDICTION AND VENUE ................................................................................7

III.    PARTIES ..................................................................................................................8

IV.     BACKGROUND OF CHS AND QUORUM .............................................................9

V.      GAAP REQUIREMENTS FOR GOODWILL AND LONG-LIVED ASSETS ............11

        A.      GAAP Provisions Concerning Goodwill and Goodwill Impairment .................12

                1.      Goodwill Impairment Analysis .................................................................15

        B.      GAAP Provisions Concerning Long-Lived Assets............................................16

VI.     DECLINING PERFORMANCE OF CHS AND QUORUM THROUGH 1Q 2016 ......18

        A.      Declining Performance of CHS Prior to Quorum Spin-Off................................18

        B.      Declining Performance of Quorum....................................................................30

VII.    THE GOODWILL AND LONG-LIVED ASSETS OF QUORUM AND CHS WERE
        IMPAIRED AS OF 1Q 2016 .........................................................................................36

        A.      Quorum's Goodwill Was Impaired As of the Date of the Spin-Off ...................36

        B.      Quorum's Long-Lived Assets Were Impaired As of the Date of the Spin-Off ...43

        C.      Additional SEC Violations .................................................................................45

VIII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS .......46

IX.     THE TRUTH EMERGES...............................................................................................48

X.      CLASS ACTION ALLEGATIONS ..............................................................................50

                COUNT I .........................................................................................................53

                COUNT II ........................................................................................................57

XI.     PRAYER FOR RELIEF ................................................................................................58

i

XII.     DEMAND FOR TRIAL BY JURY ...................................................................................59

ii

This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Quorum Health Corporation ("Quorum" or the "Company") securities between May 2, 2016 and August 10, 2016, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against Quorum, Community Health Systems, Inc. ("CHS") and certain top officials of each company.

Lead Plaintiff Zwick Partners, LP ("Lead Plaintiff" or "Zwick") and Plaintiff Aparna Rao ("Rao", collectively "Plaintiffs") allege the following based upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon investigation of counsel, including, among other things: (i) review and analysis of public filings made by Quorum and CHS with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases and other publications disseminated by the Defendants; (iii) review of news articles and conference call transcripts; and (iv) review and analysis of other publicly available information concerning Quorum and CHS. The investigation of the facts pertaining to this case is ongoing. Plaintiffs believe that additional evidence will support the allegations herein after a reasonable opportunity for discovery.

I.      **SUMMARY OF THE ACTION**

1.      This complaint stems from Defendants' knowing or deliberately reckless issuance of Quorum's false financial results and narrative by Defendants related to those financial results disseminated to investors in SEC filings, press releases and during earnings calls.  Quorum's financial results and Defendants' representations were materially false because Defendants knowingly or recklessly failed to properly account for impairments to the Company's goodwill and long-lived assets based on facts known or reasonably available to them.

1

2.     CHS is one of the nation's largest operators of general acute care hospitals. The organization's affiliates own, operate or lease 158 hospitals in 22 states with approximately 26,000 licensed beds.  Quorum was spun off from CHS, effective April 29, 2016, consisting of 38 rural community hospitals in 16 states and Quorum Health Resources, which provides management and consulting services.   On May 2, 2016, Quorum's common stock began trading on the New York Stock Exchange ("NYSE") under the ticker symbol "QHC."

3.     Quorum's assets were impaired as of the date of the spin-off on April 29, 2016, but Defendants concealed this information from investors. Defendants' accounting fraud concealed from investors the poor performance of the Company all the while overstating the Company's financial results. As a result, investors purchased stock at artificially inflated prices.

4.      On April 1, 2016, a Form 10 was filed with the SEC in connection with the spin-off of Quorum from CHS stating the Company's assets included $876 million in property plant and equipment and $541.7 million in goodwill.  Quorum attributed $508.4 million of that value to its hospital operations reporting unit.  Quorum's goodwill was allocated as a portion of CHS's goodwill.

5.     Defendants' representations were materially false. According to Generally Accepted Accounting Principles ("GAAP"), which Defendants represented they had complied with, there were numerous indicators or triggering factors, each sufficient on its own and for even more than sufficient holistically, that indicated to Defendants that it was more likely than not that Quorum's goodwill and long-lived assets were impaired as of the date of the spinoff. These indicators included a sustained decrease in share price (and corresponding decline in market capitalization) for CHS and Quorum, a decline in overall financial performance of CHS and Quorum , the underperformance of Quorum's hospitals, a deterioration in the hotel

2

management industry in which Quorum and CHS operate, and Quorum's rural community hospitals experience increased competition from larger hospitals. Quorum met five of the seven specific triggering factors identified by the requisite GAAP provision. As set forth below, the Company objectively and overwhelmingly met these factors.

6. Regarding the sustained decrease in share price (and corresponding decline in market capitalization), prior to Quorum filing its 1Q 2016 Form 10-Q on May 11, 2016, CHS's share price had plummeted from $64.04 on June 26, 2015 to just $14.09 on May 10, 2016, **a decline of 78%**. Similarly, between April 29, 2016 (the date of the spin-off) and May 11, 2016, Quorum's stock price dove from $13.50 to $9.93, **a decline of 26%**. CHS's average stock price from February 16, 2016 through May 11, 2016 was $17.08. This sustained 320-day decline was longer than the sustained stock price decline cited by numerous other publicly-traded companies in determining that the decline required testing for goodwill impairment.

7. The stock price decline corresponded to CHS's market capitalization plunging by $5.6 billion – almost 78% – between June 26, 2015, and May 11, 2016. Between April 29 and May 11, 2016, Quorum's market capitalization plummeted by $105.2 million, or 26%.

8. When Defendants belatedly tested for goodwill and long-lived assets impairment as of June 30, 2016, it was the significant stock price decline and corresponding decline in market capitalization they cited as the reasons. Those reasons, however, were manifestly present for Q1 2016. Indeed, neither Quorum's nor CHS's stock price significantly declined between May 11 (when Quorum filed its 1Q 2016 Form 10-Q) and when CHS and Quorum took their impairments in their 2Q 2016 Form 10-Qs, filed on August 3 and 10, 2016, respectively. To the contrary, Quorum's stock price **increased** from $9.98 on May 9 (the day before its 1Q 2016 announcement) to $10.02 on August 10, 2016. Similarly, CHS's stock price declined only 7.8%

3

from $14.09 on May 11 to $12.93 on August 3, 2016. Thus, the impairment indicators requiring an impairment of goodwill and long-lived assets existed prior to Quorum's spin-off and filing of its Q1 results, not after.

9.      Quorum and CHS also experienced declining financial performance prior to the spin-off, which is another triggering event for goodwill and long-lived assets impairment. In 3Q, 4Q 2015 and 1Q 2016, CHS experienced significant declines in year-over-year results, and drastically missed analyst expectations and management's own projections. During CHS's earnings calls, CEO Smith repeatedly stated that management was "disappointed" in each quarter's results. The total volume including emergency room visits were down as compared to the prior year. There was also a significant decline in adjusted EBITDA.

10.     The poor results continued for the first quarter (prior to the spin-off). As a Barclays analyst observed: May 3, 2016 report titled "Larger Miss on Margin Pressure, with Significant Cut to Guidance, Barclays stated:

> Over the past year, we have written numerous times about the challenges facing Community Health Systems, and **the first quarter of 2016 is once again a continuation of those negative trends. In fact, we view this quarter as somewhat worse than other recent earnings misses** as the pressure came more on margins and less on volumes. This was the third consecutive quarter that Community has missed the consensus by more than 10%. The quarter was marked by volumes and payor mix that were actually in line with our estimates and all of the pressure coming from various cost items. . . . As we look forward, **Community cut its guidance for operating earnings** . . .

11.     For Quorum, There was clearly a decline in the overall financial performance along with an increase in cost factors that had a negative effect on future earnings and future cash flows in the hospitals that were spun-off from CHS beginning at least as early as March 31, 2016. For example, (i) Quorum experience a net operating **loss** of $5 million, compared to net income of $6.2 million for 1Q 2015; (ii) income from operations for the three months ended March 31, 2016 was $21.1 million, compared with income from operations of $34.3 million in

4

the same period in 2015, a drop of approximately 38% (iii) The Adjusted EBITDA for hospital operations for the first quarter 2016 was $56.0 million as compared to $66.0 million for the same period in 2015, a drop of approximately 15.2%,  (iv) management knew that significant (and known) costs that had previously been absorbed by CHS would now be paid by Quorum, and (v) facilities that Quorum was attempting to divest produced negative adjusted EBITDA of approximately $4.9 million in the first quarter.

12.     Indeed, several former employees confirmed that the hospitals spun-off from CHS into Quorum were small rural hospitals were "dogs" that were performing even worse than CHS's average hospital, many of which were losing money, closing or being sold.  There was also deterioration in the environment in which some of the Quorum hospitals operated with increased competition from larger hospitals.

13.     These factors informed Defendants that it was more likely than not that the fair value of Quorum's hospitals was less than its carrying amount, which required Defendants to test for goodwill and long-lived assets impairment. Defendants did not test. Had the Defendants tested for impairment before the issuance of the first quarter 2016 financial statements they would have learned that the goodwill (and long-lived assets) was impaired at the time it was initially allocated to Quorum from CHS in connection with the spin-off. Testing would have required Defendants to write down approximately $205 million of Quorum's $508.4 million (40%) in goodwill for the quarter ended March 31, 2016, as well as record approximately $45.4 million of impairment to long-lived assets. As a result, Quorum's financial results reported by Defendants in the April 1, 2016 Form 10 and 1Q 2016 Form 10-Q were false and misleading.

14.     The reason for Defendants' fraud is simple.  Prior to the spin-off, CHS had the second highest debt level among the large investor-owned hospital companies, with a debt-to-

EBITDA ratio of 8.2x. With CHS's results and stock price plummeting, Defendants knew that selling off poorly performing hospitals to third parties piecemeal would likely result in little cash and would take a long time. In order to dump its worst performing hospitals, improve its performance and generate cash to pay down its huge debt, Defendants chose to spin-off 38 of its worst hospitals into a separate entity. Moreover, as part of the spin-off Defendants caused Quorum to take on $1.2 billion in debt, all of which was paid back to CHS as a "special dividend". By waiting until after the spin-off to write down the goodwill and long-lived assets of Quorum (and CHS), Defendants were able to make Quorum look more appealing to investors and secure more financing, which was paid to CHS. Today, Quorum, not CHS has the highest debt-to-EBITDA ratio at 6.9x.

15. As a result of Defendants' fraudulent scheme, Quorum's stock price was inflated throughout the Class Period.

16. Investors did not learn the truth until August 10, 2016, when Quorum issued a press release and filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the three months ended June 30, 2016. Quorum reported a substantial net loss and an operating loss for the quarter. Defendants blamed the large operating loss on the $250.4 million in impairment charges Quorum had taken in the quarter, including $200 million related to the carryover allocation of goodwill at the time of the spin-off from CHS; $5 million in goodwill based on management's decision to divest certain hospitals; and $45.4 million to reduce certain long-lived asset values in property, equipment and software.

17. On this news, Quorum's share price fell $4.99, or 49.8%, to close at $5.03 on August 11, 2016.

18.     On August 11, 2016, after the market closed, Quorum hosted a conference call to discuss the Company's quarterly results.  During the call, Defendant CFO Michael J. Culotta ("Culotta"), admitted that the impairment should have been taken earlier, stating "**there were indicators of impairment**" at the time of Quorum's spin-off from CHS.  Similarly, Defendant CEO Thomas D. Miller ("Miller") admitted, "**there was a lack of focus on many of these matters leading up to the spin**."

19.     CHS's 2Q 2016 financial results confirmed that the impairments should have been taken prior to the spin-off.  CHS also took an impairment charge of approximately **$1.6 billion related to goodwill**. The coordination of these impairments by Quorum and CHS in the quarter immediately following the spin-off (during which time neither company's stock price or market capitalization declined significantly) belies any claim by Defendants that the indicators of impairment did not manifest until after the spin-off.  This was no coincidence.  This was fraud.

## II.     JURISDICTION AND VENUE

20.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

22.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendants Quorum and CHS are headquartered within this District.

23.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

7

### III.    PARTIES

24.    Plaintiffs, as set forth in their previously filed Certifications (ECF No. 1-1; 39-3), acquired Quorum securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective events.

25.    Defendant Quorum is incorporated in Delaware, and the Company's principal executive offices are located at 1573 Mallory Lane, Brentwood, Tennessee 37027.  Quorum's common stock trades on the NYSE under the ticker symbol "QHC."

26.    Defendant CHS is incorporated in Delaware, and its principal executive offices are located at 4000 Meridian Boulevard, Franklin, Tennessee 37067.

27.    Defendant Wayne T. Smith ("Smith") has served as CHS's President and CEO since 1997 and Chairman of the Board of Directors since February 2001. Smith signed each of the CHS's quarterly reports filed on Form 10-Q and annual reports filed on Form 10-K from August 2015 through the end of the Class Period.

28.    Defendant W. Larry Cash ("Cash") has served as CHS's CFO since 1997, and is currently a member of the Company's Board of Directors.  Cash signed each of CHS's quarterly reports filed on Form 10-Q and annual reports filed on Form 10-K from August 2015 through the end of the Class Period.

29.    Defendant Miller served as a member of the Quorum Board of Directors and as the Company's CEO during the Class Period. Prior to the spin-off, Miller served as Division President—Division V Operations for CHS and oversaw the operations of affiliated hospitals in Indiana, New Jersey, Ohio and Pennsylvania. He joined CHS in connection with the acquisition of Triad Hospitals, Inc. in July 2007. Prior to joining CHS, from 1998 through 2007, he served as the president and chief executive officer of Lutheran Health Network in northeast Indiana, a system that has grown to include eight hospital facilities. During his tenure at Lutheran, the

8

health system was operated by Quorum Health Group, Inc., a predecessor of Quorum Health Resources.

30.     Defendant Culotta served as Quorum's CFO and Executive Vice President during the Class Period. Prior to the spin-off, Culotta served as Vice President of Investor Relations for CHS. Culotta joined Community Health Systems in 2013. He has served as chief financial officer at two publicly traded companies, both of which were spin-offs. From 2007 to 2013, Culotta was chief financial officer of PharMerica Corporation. He held the same role at LifePoint Hospitals from 2001 to 2007. Prior to that, Culotta was a partner with Ernst & Young where he worked for 24 years.

31.     The Defendants referenced above in ¶¶ 27-30 are sometimes referred to herein as the "Individual Defendants."

IV.     **BACKGROUND OF CHS AND QUORUM**

32.     CHS is one of the nation's largest operators of general acute care hospitals. The organization's affiliates own, operate or lease 158 hospitals in 22 states with approximately 26,000 licensed beds.

33.     Quorum is an independent operator and manager of general acute-care hospitals and outpatient services in the nation, with facilities in 16 states.  Quorum was spun-off from CHS, effective April 29, 2016.  Under the terms of the spin-off, CHS stockholders who held CHS common stock as of April 22, 2016, the record date, received a distribution of one share of Quorum common stock for every four shares of CHS common stock, plus cash in lieu of any fractional shares. CHS's stockholders owned all of the outstanding common stock of Quorum upon completion of the spin-off.  On May 2, 2016, Quorum's common stock began trading on the NYSE under the ticker symbol "QHC."

34.     In 3Q 2015, CHS announced that it would be spinning-off 38 of its rural community hospitals into what would become Quorum.  The hospitals had an aggregate of 3,635 licensed beds spread across 16 states, primarily located in counties having populations of 50,000 or less.

35.     The spin-off, and the cash it would generate for CHS was of critical importance to CHS.  As discussed below, the 38 hospitals were smaller hospitals and among some of the worst performing in CHS's portfolio. Moreover, CHS was saddled with a huge amount of debt.  As of 3Q 2015, CHS had the highest debt levels among the large investor-owned hospital companies.

| Stock Symbol | Hospital Chain | Debt-to-EBITDA ratio |
|---|---|---|
| CYH | Community Health Systems | 8.2x |
| HCA | HCA Holdings | 6.2x |
| THC | Tenet Healthcare | 11.1x |
| LPNT | LifePoint Health | 4.3x |
| UHS | Universal Health Services | 2.5x |

Analysts recognized CHS's immense debt as a serious concern.  As one analyst noted, misses in EBITDA could be disastrous for the company's market capitalization: "The hospital group maintains trailing leverage ratios that average approximately 4.5x. The enterprise values of these companies are between 2.1x (Universal Health) and 6.7x (Community [Health Systems]) above their market caps. With that, small changes in EBITDA can effect large changes in market caps assuming even flat multiples." The spin-off would allow CHS to dump hospitals that were a drag on its financial performance (without having to sell them piecemeal to other hospital companies, if anyone would even want them) while at the same time giving CHS an injection of cash to pay down its massive debt.  Indeed, in its April 29, 2016 announcement of the spin-off, CHS expressly stated "CHS intends principally to use these proceeds to repay secured indebtedness."

10

## V.    GAAP REQUIREMENTS FOR GOODWILL AND LONG-LIVED ASSETS

36.    The fraud alleged herein arises from Defendants' violation of GAAP.[1]

37.    One of the basic doctrines underlying accounting is the concept of neutrality, as expressed in the Statement of Financial Concepts No. 8, September 2010, Conceptual Framework of Financial Reporting ("SFAC 8"). "The Conceptual Framework . . . is intended to serve the public interest by providing structure and direction to financial accounting and reporting to facilitate the provision of unbiased financial and related information. That information helps capital and other markets to function efficiently in allocating scarce resources in the economy and society." *Id*. "To be useful, financial information . . . must faithfully represent the phenomena that it purports to represent" and should be "complete, neutral, and free from error" to the "extent possible." *Id*. at 17. "A neutral depiction is without bias in the selection or presentation of financial information. A neutral depiction is not slanted, weighted, emphasized, deemphasized, or otherwise manipulated to increase the probability that financial information will be received favorably or unfavorably by users." *Id*. at 18.

38.    The specific accounting violations here concern when to test for goodwill impairment and when to write down goodwill and long-lived assets. These accounting activities require the application of neutral and unbiased accounting.

39.    Whether and when goodwill and long-lived assets were impaired depends, in substantial part, on estimates of future undiscounted and discounted cash flows. A calculation of future cash flows involves projecting changes to the current cash flows generated by operations

---

[1] GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation SX (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).

into the future, discounted by an appropriate interest rate (because time has value) and there are risks associated with achieving such cash flows:

a. Current free cash flows are calculated by subtracting operating expenses from cash flows from operating activities. This is an objectively calculable factor.

b. The components of the interest rate by which projections should be discounted must represent realistic macroeconomic assumptions and observable inputs that market participants would use (e.g., the current interest rate on a 20-year Treasury bond). This is an objective factor.

c. The projected changes to current free cash flows is a subjective, speculative factor involving considerations including: performance year-to-date, trends in free cash flows over time, the competitive landscape, management track records, acquisitions, new products and other considerations bearing on a company's future performance. Because this factor is a significant uncertainty, the application of conservative accounting applies.

40. The financial statements from Quorum's Form 10 concerning the spin-off and 1Q 2016 Form 10-Q alleged to be false herein were not audited by Quorum's or CHS's independent auditors. CHS's most recent impairment evaluation prior to the spin-off of Quorum was done as of September 30, 2015[2], and would not have been audited prior to the issuance of the Q3 2015 Form 10-Q. Indeed, the Form 10 created by Defendants for the spin-off, specifically states that the financial results included therein were "unaudited". Quorum's financial statements included in its 1Q 2016 Form 10-Q were likewise unaudited. Regardless, the basic tenet of financial reporting in the United States that management is ultimately responsible for an entity's financial statements and furthermore, "Management is responsible for adopting sound accounting policies." AU Section 110.03.

A. **GAAP Provisions Concerning Goodwill and Goodwill Impairment**

41. Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination. Accounting Standards Codification ("ASC") 805-10-

---

[2] CHS 2Q 2016 Form 10-Q, page 26 fn. 8.

05-4 "requires that a business combination be accounted for by applying the acquisition method." ASC 805-20-30-1 describes the acquisition method, which requires the acquiring company to record the assets acquired and liabilities assumed at their respective fair market values as of the date of the acquisition. ASC 805-10-20 describes fair value as "[t]he price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." ASC 350-20-35-16 states that "[t]he excess of the fair value of a reporting unit over the amounts assigned to its assets and liabilities is the implied fair value of goodwill."

42.     A reporting unit is an operating segment of a company or one level below an operating segment (also known as a component). ASC 350-20-20 Glossary. Quorum has two distinct operating segments consisting of its hospital operations and its management advisory and consulting services business.  For purposes of its goodwill impairment testing, Quorum considers its hospital operations segment to be a separate reporting unit.

43.     Pursuant to ASC 350-20-35-2, "[i]mpairment is the condition that exists when the carrying amount [or book value] of goodwill exceeds its implied fair value." Following an acquisition, companies are required to account for any goodwill recorded as part of the acquisition in accordance with ASC 350-20. ASC 350-20-35-28 requires goodwill to be tested annually and, as is at issue here, for any quarter when certain circumstances are present.

44.     ASC 350-20-35-3A requires that a company test goodwill for any quarter when an assessment of "qualitative factors" determines that "more likely than not (that is a likelihood of more than 50 percent) that the fair value of a reporting unit is less than its carrying amount, including goodwill."[3]

---

[3] "An entity has an unconditional option to bypass the qualitative assessment . . . and proceed directly to performing the first step of the goodwill impairment test. An entity may resume performing the qualitative

13

### 1. Goodwill Impairment Analysis

45.     The goodwill impairment analysis requires impairment testing for any quarter when certain triggering events are present "that would more likely than not reduce the fair value of a reporting unit below its carrying amount." ASC 350-20-35-30.[4] Pursuant to ASC 350-20-35-3C, examples of such triggering events include, but are not limited to, the following:

a.     Macroeconomic conditions such as deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets

b.     Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development

c.     Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows

d.     Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods

e.     Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation

f.     Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing all, or a portion, of a reporting unit, the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit

g.     If applicable, a sustained decrease in share price (consider in both absolute terms and relative to peers).

46.     ASC 350-20-35-3E required Defendants to test for goodwill impairment if **any** triggering events, including but not limited to any of the examples given above, alone or in

---

assessment in any subsequent period." ASC 350-20-35-3B.
        [4] "Goodwill of a reporting unit shall be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount." ASC-350-20-35-30.

combination, made it more likely than not the fair value of reporting unit is less than the book value or carrying amount. ASC 350-20-35-3E also provides that the triggering events must be considered holistically. In other words, even if no individual triggering event is sufficient, on its own, to make it more likely than not the fair value of the reporting unit is less than the book value, if the "totality" of the events and circumstances described above, as applied to Quorum, made it more likely than not that the fair value of a reporting unit was less than its carrying amount, then Defendants were required to perform the first step of the two-step goodwill impairment test.

47.     ASC 350-20-35-4 provides that "[t]he first step of the goodwill impairment test, used to identify potential impairment, compares the fair value of a reporting unit with its carrying amount, including goodwill." 31 ASC 350-20-35-11, in turn, describes step two of the goodwill impairment analysis: "If the carrying amount of reporting unit goodwill exceeds the implied fair value of that goodwill, an impairment loss shall be recognized in an amount equal to that excess. The loss recognized cannot exceed the carrying amount of goodwill." When the implied goodwill is less than the carrying value of the goodwill, the company must immediately recognize a goodwill impairment charge. ASC 350-20-35-2, 4, 8, 9, 14-17.

48.     Moreover, factors that were based on observable inputs are entitled to greater weight than those based on inputs (such as forecasts) in the analysis because observable inputs reflect the assumptions market participants would use. ASC 820-10-05-1C requires that, "[w]hen a price for an identical asset or liability is not observable, a reporting entity measures fair value using another valuation technique that maximizes the use of relevant observable inputs and minimizes the use of unobservable inputs. Because fair value is a market-based measurement, it is measured using the assumptions that market participants would use when pricing the asset or

liability, including assumptions about risk." *Cf.* SFAC 8 at 18 (accounting must strictly avoid bias, slanting and manipulation undertaken "to increase the probability that financial information will be received favorably").

49. At the time of the spin-off, the goodwill for Quorum's hospitals was identified as $541 million. As identified in the April 1, 2016 spin-off Information Statements filed with the SEC, that goodwill "was allocated from [CHS] to the Company's hospital operations reporting unit based on a relative fair value approach as of September 30, 2013 ([CHS]'s goodwill impairment testing date)." As Defendant Culotta would later admit, this calculation of goodwill and the allocation from CHS was based on the stock price of CHS as of September 30, 2013, which was $41.50.

50. Quorum's first quarter 2016 financial statement filed with the SEC on May 11, 2016 on Form 10-Q stated "The fair value of the related reporting units is estimated using both a discounted cash flow model as well as a multiple model based on earnings before interest, taxes, depreciation and amortization ("EBITDA"). The cash flow forecasts are adjusted by an appropriate discount rate based on the Company's best estimate of a market participant's weighted-average cost of capital. Both models are based on the Company's best estimate of future revenues and operating costs."

51. Thus, two primary factors in determining goodwill and its allocation to Quorum as part of the spin-off was stock price and EBITDA. As discussed below, both indicated that Quorum's goodwill was severely impaired.

**B.      GAAP Provisions Concerning Long-Lived Assets**

52. GAAP required the Company to test its long-lived assets for impairment as follows: "A long-lived asset (asset group) shall be tested for recoverability whenever events or

changes in circumstances indicate that [the] carrying amount may not be recoverable." ASC 360-10-35-21.

53.     Similar to goodwill, Under ASC 360, long-lived assets that are currently being depreciated or amortized should be tested for impairment if there is a "triggering event" such as:[5]

a.     A significant decrease in the market price of a long-lived asset (asset group).

b.      A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition.

c.     A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator.

d.     An accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group).

e.     A current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group).

f.     A current expectation that, more likely than not, a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life. The term more likely than not refers to a level of likelihood that is more than 50 percent.

54.     Once a determination that the circumstances were met requiring testing, GAAP required Defendants to apply a two-part test to determine whether long-lived assets were, in fact, impaired. In step one, one must determine whether the carrying amount of a long-lived asset (or asset group) exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. ASC 360-10-35-17. If so, one proceeds to step two to determine the amount by which the carrying amount exceeds the expected discounted cash flows. ASC 360-10-35-17, 18. An "impairment loss shall be recognized only if the carrying amount of a long-lived asset (asset group) is not recoverable and exceeds its fair value." ASC 360-10-35-17.

---

[5] ASC 360-10-35-21

17

55.     As part of step one, Defendants were required to consider all available evidence:

Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall incorporate the entity's own assumptions about its use of the asset (asset group) and shall consider all available evidence. The assumptions used in developing those estimates shall be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods, such as internal budgets and projections, accruals related to incentive compensation plans, or information communicated to others.

ASC 360-10-35-30.

GAAP further requires that bias, slanting, and manipulation of the presentation of financial information "to increase the probability that financial information will be received favorably" be strictly avoided. SFAC 8 at 18.

## VI.     DECLINING PERFORMANCE OF CHS AND QUORUM THROUGH 1Q 2016

56.     During the ten months prior to the spin-off of Quorum, CHS and Quorum (both as part of CHS and independently) reported dismal financial results, which caused an unprecedented cratering of each company's stock price, market capitalization and expected cash flow, which the stock price represented.

### A.     Declining Performance of CHS Prior to Quorum Spin-Off

57.     On June 26, 2015, CHS' stock price closed at $64.04.

58.     In CHS's Form 10-Q filed with the SEC containing the company's financial results for the three months ending June 30, 2015 (2Q 2015) CHS stated that its goodwill was approximately $9.0 billion.

59.     On August 3, 2015, CHS announced that "it plans to create a new publicly traded hospital company by spinning-off to Community Health Systems' stockholders a group of 38 hospitals and Quorum Health Resources, LLC, a leading hospital management and consulting business. The new company will be named Quorum Health Corporation." Smith represented that the hospitals that would make up Quorum were "high-quality" and would spur growth: "With an

18

attractive portfolio of high-quality community hospitals, streamlined management structure and independent access to capital markets, Quorum Health Corporation is expected to have an enhanced ability to drive growth by capitalizing on acquisition opportunities consistent with its portfolio, developing facility specific operating strategies aligned with its community needs and better leveraging its management and consulting capabilities."

60.     On Monday August 3, 2015, after the close of trading, CHS reported its second quarter 2015 results.  Although the Company reported EPS above consensus, analysts observed that "the top-line was weak on soft admission levels."  Same-facility admissions declined 2.2% vs. the consensus 0.7% decline.  Same-facility adjusted admissions declined 0.2% compared to the expected 1.4% consensus increase.  Moreover, net revenue of $4.882 billion was below the $4.98 billion consensus driven by weak admissions. As a result, CHS lowered its revenue outlook for 2015 by $300 million at the top-end of the range with the revised range at $19.6-$20.3 billion.  CHS also lowered the top-end of its EBITDA guidance outlook by $35 million with the new range at $3.0-3.165 billion as admission pressures were likely expected to continue.

61.     Notably, the spin-off assets that would become Quorum generated lower than average EBITDA margin in 2014. The Quorum assets generated $2.1 billion in revenue and $255 million in EBITDA in 2014. This equates to ~12% EBITDA margin compared to 14.9% CHS-wide result recorded in 2014. The 19% of hospitals being spun-out drove only about 11% of 2014 revenue.

62.     On August 4, 2015, after the close of trading, CHS filed its financial results for 2Q15.

63.     CHS's stock price declined from $59.19 on August 4, 2015 to $56.82 on August 5, 2015 on heavy trading volume. CHS's stock price continued to steadily decline from $56.82 on August 5, 2015 to $40.55 on October 21, 2015.

64.     On October 21, 2015, CHS announced the Company's estimated results for third quarter 2015. The results constituted a 2% miss to revenue, a 13% miss to adjusted EBITDA and a 37% miss to EPS vs. consensus estimates. Specifically, CHS announced net revenue of $4.846 billion, lower than the consensus estimate of $4.95 billion, a 2% decline. The company anticipated income from continuing operations before taxes to be $121 million, compared with $133 million for the three months ended September 30, 2014, a 9% decline. Adjusted EBITDA was expected to be $661 million, compared with $750 million for the same period in 2014, an 11.9% decline. Income from continuing operations was expected to be $0.56 per share (diluted), compared with $1.01 per share (diluted) for the three months ended September 30, 2014, an astonishing 44.6% decline. The consolidated operating results reflected a 1.9 percent decrease in total admissions, compared with the same period in 2014. On a same-store basis, admissions decreased 2.1 percent, compared with the same period in 2014.

65.     CHS also reduced its 2015 guidance yet again, tightening its expected range for revenue to $19.5-$19.8 billion (was $19.6-$20.3billion), adjusted EBITDA to $2.9-$3.025 billion (was $3.0-$3.165 billion) and adjusted EPS to $3.40-$3.75 (was $3.65-$4.10).

66.     The company attributed the disappointing results in the quarter to volume and payer mix weakness compared to the first half of the year, as well as increased costs as a percentage of revenues in multiple areas.

67.     On this news, CHS stock price plummeted $14.25 (or 35.2%), from $40.44 on October 21, 2015 to $26.30 on October 22, 2015.

20

68.     Analysts were in universal agreement that the results were extremely disappointing and revised their expectations for the fourth quarter downward.  An analyst with Barclays observed "Last night after close, investors in hospital management companies received a confirmation of the pressure on earnings that HCA revealed with their preannouncement last Wednesday night. If there was any doubt left, **it now seems pretty clear that this is an industry issue.**"

69.     However, more than just an industry problem, CHS was performing particularly poorly.  As one analyst at Leerink wrote: "We view this release as disappointing and much worse than expected on top of already weak expectations . . ."

70.     On November 2, 2015, CHS announced its final results for third quarter 2015, in line with its previously announced expectations, and filed its Form 10-Q with the SEC on November 3, 2015.  During the November 3, 2015 earnings call, CEO Smith stated at the outset, "***We'd like to make it very clear that we are disappointed in our results for this quarter***." Smith made clear that the company was attempting to dump its underperforming hospitals that were a drag on its financial results.  "We're immediately taking action and steps to address this decline. First, with the planned spin-out of Quorum Health, we've made internal decisions on the re-alignment of our divisions and personnel. This includes a series of forthcoming announcements about new leadership for some of our operating divisions. Second, we're going to continue to review our portfolio rationalization. We have already sold six hospitals in 2015 and have two more under contractual agreements to sell."

71.     CHS's stock price continued its steady decline, sliding from $26.30 on October 22, 2015 to $18.68 on February 12, 2016.

72.     On February 15, 2016, CHS announced its results for fourth quarter and year end 2015.   Things were getting even worse. Net operating revenues for the three months ended December 31, 2015, totaled $4.798 billion, a 2.4 percent decrease compared with $4.918 billion for the same period in 2014. Income from continuing operations decreased to a loss of $(74) million, or $(0.66) per share (diluted) compared with income of $129 million, or $1.12 per share (diluted), for the same period in 2014. The financial results for the fourth quarter also include a $169 million increase in the Company's allowance for doubtful accounts and a corresponding $169 million increase to the provision for bad debts. Net income was a loss of $(0.73) per share (diluted), compared with income of $0.87 per share (diluted) for the same period in 2014. Adjusted EBITDA, was $527 million compared with $785 million for the same period in 2014, representing a 32.9 percent decrease.

73.     The results also reflected a 3.6 percent decrease in total admissions compared with the same period in 2014. On a same-store basis, admissions decreased 3.4 percent compared with the same period in 2014.

74.     As analysts observed, the 4Q results were well below both consensus expectations and CHS's own guidance (which had already been repeatedly adjusted downward). CHS missed on almost all metrics.  CHS's net revenue was $4.8 billion, missing consensus by 3.7%.  Q4 EBITDA of $527 million missed consensus by 31%.  CHS missed on all metrics including Bad Debt, Volumes, Labor Cost ratio, Supplies and Other Expenses ratio with the exception of Pricing. 4Q adjusted EBITDA came in at $696 million, 8.7% below consensus of $762M and 14.9% below the $817.5 million midpoint of CHS's own guidance of $755-880 million. Adjusted EPS for the quarter was $0.68, 28.4% lower than consensus of $0.95. The 4Q EBITDA of $696M came in ~$100M below CHS's guidance. The company reported a 3.4% decrease in

22

same store admissions, which comes after a 2.1% decline in 3Q 2015. Moreover, the provision for doubtful accounts were approximately 29.2% above analyst estimates as a result of a $169 million change in bad debts estimate adjustment.

75.    On this news, CHS's stock price again plummeted $4.12 (or 22%) from $18.68 on February 12, 2016 to $14.56 on February 16, 2016.

76.    Analysts recognized that CHS's recent results demonstrated that the company's cash flow was in critical danger. As one analyst for Barclays observed "Basically, Community wasn't collecting as much revenue as it was recording in the past. . . . Apparently the company was overestimating how much it collects from patient copays/deductibles, the time to collect and also underestimating personal bankruptcies." An analyst for KeyBank Capital Markets observed, "While those results are disappointing enough, we believe the $169M increase in bad debt expense will likely weigh on the entire publicly traded hospital group because this has been a challenge for the group in the past." On CHS's continued downward spiral, an RBC Capital Markets drastically lowered its price target from $45 to $18.  In a report titled "Continued Operating Misses and Leverage Create Further Pressure", an analyst for Barclays reported:

> **The past year has been one of the most challenging years for Community Health Systems, and the fourth quarter earnings report was unfortunately a continuation of trends seen in the first nine months of the year**. The quarter was marked by an increase in uncompensated care, weaker volumes, unfavorable payor mix shift, higher operating expenses and **much lower cash flow**. The press release contained so many "excuses" that candidly, it is hard to really know what is pressuring earnings the most. **Compounding the operating problems is the fact that Community is the most highly levered hospital company we cover which continues to put more pressure on equity owners**.

77.    Discussing CHS's cash flow, the Barclays analyst stated:

> **4Q15 cash flow decreased $670 million compared to the prior year to an inflow of $306 million. . . Cash flow in the quarter was well below our estimate of a $926 million inflow**.

78.     CHS's plummeting results and cash flow was compounded by its immense debt and high leverage situation:

> It is also very important to understand the leverage situation at Community, with a market cap that makes up just 11% of the enterprise value (prior to this announcement). Community Health has approximately $16.87 billion in net debt, which represents over 6.3x 2015 EBITDA (as adjusted by the company). Net debt still equates to 5.7x forward EBITDA, and that assumes that trends change and the company is able to attain its guidance for 2016. When you look at the leverage, there are significant implications for equity holders.

79.     During the February 16, 2016 earnings call, CEO Wayne T. Smith stated: "First, I want to state the obvious: **we're disappointed in the quarter's results and in where we ended the year.** Clearly, we expected to deliver a better performance."

80.     The Quorum spin-off, which had been scheduled for January 2016, was delayed by CHS.  Wayne told investors that the reason for the delay was that it would be difficult for Quorum to access the debt it needed (the cash from which would in turn be paid directly to CHS).  Addressing the contemplated Quorum spin-off, he stated "The decision to delay the spin, as we have previously stated, is the sudden disruption in the debt markets. . . . We expect to complete the spin once market conditions are favorable."

81.     CHS's results for the first quarter 2016, ending March 31, 2016, were no better. Income from continuing operations decreased to $12 million, or $0.11 per share (diluted), for the three months ended March 31, 2016, compared with $92 million, or $0.79 per share (diluted), for the same period in 2015, decline of 87%. Income from continuing operations was $0.27 per share (diluted).  Net income was $0.10 per share (diluted) compared with $0.68 per share (diluted) for the same period in 2015, a 85% decline. Adjusted EBITDA was $633 million compared with $715 million for the same period in 2015, representing an 11.5 percent decrease.

82.     CHS also experienced a 2.6 percent decrease in total admissions and a 2.0 decrease in same-store admissions compared with the same period in 2015.

24

83.    CHS's results also once again fell well short of consensus estimates. Its EBITDA of $633 million missed consensus of $699 by 9.5% (and adjusted EBITDA of $633 million missed consensus $705 million by 10.2%). Same store admits and unit pricing also missed consensus estimates. Operating expenses came in higher than estimates, with pressures coming across most cost line items. Cash flow of $294 million for 1Q 2016 was 18.7% below analyst estimates of a $361.6 million inflow.

84.    Notably, CHS also drastically lowered its already conservative 2016 guidance on net revenue of $20-20.6 billion and EBITDA of $2.9-3.05 billion to $17.8-18.3 billion (a 10.9% reduction) and $2.6-2.7 billion (an 11.5% reduction), respectively. CHS also reduced its projected cash flow from operations for 2016 from $1.5-$1.7 billion to $1.35-$1.5 billion, a decline of almost 12%.

85.    When CHS announced its 1Q 2016 results for the period ending March 31, 2016 on May 2, 2016 its stock price plummeted yet again, declining $5.11 (or 26.8%) from $19.08 on April 29, 2016 to $14.87 on May 3, 2016.

86.    In a May 3, 2016 report titled "Larger Miss on Margin Pressure, with Significant Cut to Guidance, Barclays stated:

> Over the past year, we have written numerous times about the challenges facing Community Health Systems, and **the first quarter of 2016 is once again a continuation of those negative trends**. **In fact, we view this quarter as somewhat worse than other recent earnings misses** as the pressure came more on margins and less on volumes. **This was the third consecutive quarter that Community has missed the consensus by more than 10%.** The quarter was marked by volumes and payor mix that were actually in line with our estimates and **all of the pressure coming from various cost items**. . . . Compounding the operating problems is the fact that Community is the most highly levered hospital company (and leverage moved higher this quarter) which continues to put more pressure on equity owners.

87.    CHS's leverage problems were getting worse:

25

As noted above, it is very important to understand the leverage situation at Community, with a market cap that makes up just 10% of the enterprise value (prior to this announcement). Community Health has approximately $15.7 billion in net debt (after the Quorum spin off), which represents 6.1x TTM EBITDA (as adjusted by the company) and still about 5.9x 2016 guidance (which again we suggest appears less conservative). When you look at the leverage, there are significant implications for equity holders.

88.     CHS's EBITDA had been drastically missing all estimates from July 2015 through March 2016 (3Q 2015 through 1Q 2016).

| CHS EBITDA vs Consensus | | | | |
|---|---|---|---|---|
| Quarter | Consensus | Actual | Variance | % Difference |
| 3Q15 | $759 | $661 | ($98) | -12.9% |
| 4Q15 | $766 | $527 | ($239) | -31.2% |
| 1Q16 | $705 | $633 | ($72) | -10.2% |

89.     Recognizing CHS' financial and debt troubles, Smith stated during the 1Q 2016 earnings call that the company would seek to improve its financial results and reduce its debt by divesting poorly performing hospitals through sales and the Quorum spin-off and using the proceeds to pay down its debt.: "We intend to use the substantial majority of the net proceeds of $1.21 billion from the QHC spin-off to reduce our debt, and we expect other potential divestiture transactions this year will help drive down our debt even further. As we refine our portfolio into what we anticipate will be a more sustainable, higher-margin group of hospitals, our resources and future investments can be targeted into markets where we have the greatest opportunity to achieve performance improvement in our operations and financial results."

90.     Specifically, as part of the spin-off Defendants caused Quorum to take on $1.2 billion in debt, all of which was used to pay a "special dividend" to CHS along with 28.2 million shares purportedly in exchange for all of Quorum's assets ($2.347 billion) and liabilities ($1.775 billion) – including its inflated goodwill and long-lived assets – and $20 million cash.

26

91.     Following the spin-off and $1.2 billion "special dividend" to CHS, it was Quorum, not CHS that had the industry's highest debt-to-EBITDA ratio:

| Stock Symbol | Hospital Chain | Debt-to-EBITDA ratio |
|---|---|---|
| QHC | Quorum Health Corporation | 6.9x |
| CYH | Community Health Systems | 6.3x |
| HCA | HCA Holdings | 3.7x |
| THC | Tenet Healthcare | 5.6x |
| LPNT | LifePoint Health | 3.5x |
| UHS | Universal Health Services | 2.0x |

92.     This did not address all of analysts concerns, as an analyst for Barclays noted: "We do highlight that the company seems very aware of its leverage issue and is using proceeds from the Quorum spin-off, its sale of its minority interests in Las Vegas and other potential divestitures for debt repayment. We continue to worry about the projected rebound in EBITDA, and the increasing debt load that EBITDA needs to support."

93.     CHS stock price on June 26, 2015 closed at $64.04.  CHS stock price on May 3, 2016 closed at $14.87, a staggering **decline of $49.17 – or 76.8%**.  This corresponded to a **decline of approximately $5.6 billion in market capitalization**.

94.     Not only was the stock price steadily declining (which showed a corresponding decline in expected cash flow), investors also began shorting CHS stock.  CHS's short interest as a percentage of float increased from August 2015 to March 2016 from approximately 3% to 12%. The entire Healthcare Provider industry was experiencing similar problems, although not nearly as pronounced as CHS, with the average short interests as a percentage of float for Health Care Providers Coverage increasing from August 2015 to March 2016 from about 4.5% to about 7%.

95.     Despite issues affecting all healthcare providers, CHS performance was still dismal by comparison.  As the chart below demonstrates, CHS's stock price plummeted well below sixteen "peer" companies identified in CHS's own SEC filings.



**Price Change in % since June 26, 2015**

Community Health Systems declined 77% as of May 11, 2016

Legend:
- Community Health Systems
- Aetna Inc.
- Aflac Inc.
- Henry Schein, Inc.
- AmerisourceBergen Corp
- Humana Inc.
- Anthem, Inc.
- Cardinal Health, Inc.
- LifePoint Health, Inc.
- Owens & Minor, Inc.
- Centene Corp
- CIGNA Corp
- Universal Health Services
- DaVita Healthcare Partners
- Unum Group
- HCA Holdings, Inc.
- WellCare Health Plans, Inc.

29

96.     On May 3, 2016, CHS filed its 1Q 2016 Form 10-Q, stating that its goodwill was still approximately $9.0 billion, effectively unchanged since June 30, 2016 when CHS's stock price was trading around $64.

**B.      Declining Performance of Quorum**

97.     As poor as CHS's financial results had been from July 2015 through March 2016, the hospitals that were to be spun-off into Quorum were doing even worse, as explained by former employees of CHS and Quorum.

98.     Confidential Witness #1 ("CW1") worked as the vice president of finance for Evanston Regional Hospital, a hospital in Evanston, Wyoming owned by CHS, which was one of the hospitals included in the spin-off to Quorum, from May 2015 to November 2015. CW1 was responsible for finance operations.

99.     According to CW1, the decision to include the Evanston hospital in the Quorum portfolio was made by CHS's management team.

100.    According to CW1, the spin-off was challenging because the smaller hospitals were not as profitable as the larger ones that remained behind with CHS, and the smaller hospitals did not grow as fast. The combination of slow growth, poor relations and competition effectively cut into the hospital's bottom line, with concerns arising internally while it had been part of CHS that its "market value" could fall over the next several years when the hospital would likely be forced to downsize.

101.    For example, the Evanston facility had experienced slow growth for several years prior to the spin-off, had poor relations in the community, and encountered stiff competition.

102.    There was an expectation that the spin-off was to happen by January 2016, according to CW1. "The spin-off took longer than they thought. They wanted to open with new books in January. But it never happened. There probably were some challenges," CW1 said.

30

"Health care has been changing dramatically in the last three to four years, and rural hospitals are really hurting."

103.    Prior to the spin-off, the Evanston hospital faced intense and growing competition. Evanston resident would travel 60 miles to the Park City Medical Center because they "didn't feel they were getting quality care" in their own community, CW1 said. Before the spin-off, competitors were undercutting the Evanston hospital's "urgent care, laboratories and other business that traditionally makes money for a hospital." "In 10 years, all that would be left is an ICU (intensive care unit) and ER (emergency room). You could see the trend going in that direction," CW1 said. "Competitors were moving in for outpatient surgeries."

104.    Confidential Witness #2 ("CW2") worked as a corporate accounting manager for Quorum Health Resources LLC ("QHR"), the predecessor corporation to the spin-off Quorum from July 2007 to May 2015. CW2 reported to Timothy J. Ryan, QHR's CFO.

105.    Prior to leaving QHR, CW2 was aware of "talk" to carve out the new business by placing the struggling rural hospitals into a newly created public company. CW2 questioned the legitimacy of the spin-off of Quorum as she considered the 38 hospitals placed in its portfolio "dogs," meaning that they were the rural hospitals in tiny cities with populations under 50,000 that did not show much profitability. "I questioned it. **It's like they gave Quorum the dog hospitals,**" Varner said. "They were trying to make up revenues."

106.    CW2 enjoyed working with QHR until the last year or so when CFO Ryan, in particular, got more "hands-on and weird. It didn't feel right to me. I always felt like they weren't straight shooters. I always felt like they played with the numbers."

107.    CFO Ryan (who reported to Miller and Culotta) would often request that CW2 make unexplained entries in the financial ledgers that CW2 maintained in the firm's proprietary

software system. The changes he requested were "without justification": "He'd ask for a journal entry change, to accrue more expense in order to give him a bigger cushion in case he needed to find more revenue or increase the bottom line. He wanted to push the numbers around to make the quarter." In one instance, CW2 was asked by Ryan to accrue an expense by $500,000 -- a move to increase a liability. "What it would do for him at the corporate level is increase his cushion if revenues were not met," CW2 explained. "He'd offset expenses with legal accruals. At any point where he needed expenses to go down, he'd increase his accrual and get his number."

108. CW2 was asked to make these kinds of changes on a monthly basis on the ledgers over a roughly two-year period, until she left the company. The software-based reports, or ledgers, were transmitted electronically via a secure intranet system. "It began in the summer of 2013. Miller was CEO by then. He did communicate with Ryan."

109. CW2 said the ledger changes she made could have been viewed as early "indicators of impairment" where the estimated cash flow from certain assets were less than the book value of the asset. "It smells very bad. It makes no sense. It's almost like they wanted Quorum to fail," CW2 said. "The $250 million in impairment charges tells me that Community Health wanted those hospitals (38) off the books so that it wouldn't have to take impairment charges. It protected their stock price."

110. Confidential Witness #3 ("CW3") worked as a senior vice president in charge of client service (consulting) and administration with QHR and president of Quorum Purchasing Advantage during the Class Period.

32

111. CW3 sat in on "probably six meetings" from February 2016 to April 2016, between CHS and Quorum before it was spun off in May 2016, all with the purpose of discussing job functions and company missions.

112. The CHS and QHC meetings were between the new management team of Quorum -- including CEO Miller, CFO Culotta and Martin D. Smith, executive vice president in charge of operations -- and CHS Chairman and CEO Smith, and CFO Cash. Also in attendance at some of these meetings were Bob Vento, interim CEO and chief operating officer, and Timothy J. Ryan, CFO of QHR. Not many meetings were held from Aug. 4, 2015, when the spin-off was announced by CHS and early January 2016, when CHS had hoped to complete the spin-off.

113. According to CW3, the portfolio of 38 "rural" hospitals given to Quorum was the brainchild of Smith and Cash, and were "**definitely challenged in a hard marketplace**." According the CW1, the 38 hospitals were uniquely challenged because they were based in small communities with populations of 50,000, where they faced competitive pressures from larger health care providers, and changing demographics. CW3 said that CHS was to blame for any misdeeds because **Quorum "got whatever shit CHS sent their way**."

114. According to CW3, **it was clear that the 38 hospitals were not profitable ones, describing them as "dogs."** CW3's business unit, QHR, had assessed two of the 38 hospitals prior to the spin-off, with one money-losing institution actually getting divested in January 2017. "Some of the hospitals were losing money," CW3 observed.

115. At year-end 2016 -- after the spin-off -- Quorum sold its Barrow Regional Medical Center in Winder, Georgia. "We looked at this prior to the spin-off, and it was a true dog," CW3 said. The assessment performed on the Barrow hospital was conducted in October

33

2015, at least nine months before the Quorum spin-off took place. Site visits were made to the hospital, reports were prepared and issues were identified over three- to four-day visits by consultants. The Barrow hospital had declining volumes, no population to serve and "big, strong competitors around it where the care was migrating," according to CW3. "It was losing money and would only continue to lose more."

116. The observations of the Confidential Witnesses are consistent with Quorum's financial results. Prior to CHS spinning-off Quorum on April 29, 2016, it released certain information concerning Quorum's financial results. The hospitals that made up Quorum were struggling much more than CHS as a whole.

117. For example, Quorum's net income declined from $7.801 million in 2014 to a **loss** of $5.331 million (pro forma) in 2015. Similarly, Quorum's adjusted EBITDA also declined from $264.8 million in 2014 to $263.7 million in 2015. Admissions declined from 101,217 in 2014 to 98,378 in 2015, a decline of 2.8%. CHS did not break out Quorum's quarterly results for Q3 and Q4 2015, which, as discussed above, were so terrible for CHS as a whole. Given the low quality of its hospitals as compared to CHS, Quorum's quarterly results were certainly much worse than CHS's.

118. Quorum also performed well below its peers. For example, Quorum's adjusted EBITDA Margin was consistently well below all of its peers, including the remainder of CHS.

| Quorum Adjusted EBITDA Margin vs Peers | | | | |
|---|---|---|---|---|
| | **2012** | **2013** | **2014** | **2015** |
| Quorum | 10.1% | 10.1% | 12.3% | 12.2% |
| **Peers** | | | | |
| Legacy CHS | 14.9% | 13.8% | 14.6% | 13.7% |
| HCA | 20.4% | 19.2% | 20.1% | 20.1% |
| LPNT | 16.1% | 14.6% | 14.1% | 13.5% |

34

| | | | | |
|---|---|---|---|---|
| THC | 12.9% | 12.1% | 11.7% | 12.2% |
| **Peer Average** | **16.1%** | **14.9%** | **15.1%** | **14.9%** |

119. Indeed, of the 38 hospitals that were Quorum, at least 12 hospitals had negative operating margins in the double digit range.

120. Quorum's same store admissions have also historically lagged its peers. While Quorum's peers' same-store admissions were -2.8%, 1.2% and -0.3% in 2013, 2014 and 2015, Quorum's same-store admissions for those same three years were -5.4%, -4.6% and -2.8%. Same store admissions in 2015 of -2.8% lagged legacy CHS, which reported a -2.5% year-over-year decline.

121. The unemployment rate in the communities where Quorum operated its hospitals was also historically much higher than its peers. As of December 2015, the unemployment rate in Quorum's counties was 7.3%, compared to only 4.2% of its peers (and 5.4% of legacy CHS). Admissions have demonstrated a high correlation with unemployment rates historically.

122. Quorum's poor financial results for the three months ending March 31, 2016 confirmed it troubled state. For the first quarter 2016, Quorum experience a net operating **loss** of $5 million, compared to net income of $6.2 million for 1Q 2015. Income from operations was $21.1 million, compared with $34.3 million in the same period in 2015, a decline of 38.5%. Adjusted EBITDA was $56.0 million, compared with $66.0 million for the same period in 2015, representing a 15.2% decrease. Quorum also experienced a 2.2% decrease in total admissions compared with the same period in 2015.

123. These 1Q 2016 results, which Defendants were aware of as of about March 31, 2016, had a huge impact on the expected cash flow for Quorum as evidenced by the stock price decline that occurred following the announcement of the results.

35

124.     From the first day of trading for Quorum stock on May 2, 2016 until May 10, 2016, the day of the announcement of Quorum's 1Q 2016 results, the Company's stock price declined from $13.08 to $10.33, a drop of approximately 21%. Following the announcement of Quorum's 1Q 2016 results, the stock dropped to $9.93, another 4%, resulting in a total decline since the spin-off of $3.15, approximately 24%.   This equated to a decline in market capitalization of approximately $92.8 million.

125.     In sum, CHS stock price declined approximately $76.8% from June 26, 2015 to May 3, 2016, and Quorum's stock declined another 24% from May 2, 2016 to May 11, 2016. These declines constituted **a loss of market capitalization of $5.7 billion**.

## VII.     THE GOODWILL AND LONG-LIVED ASSETS OF QUORUM AND CHS WERE IMPAIRED AS OF 1Q 2016

### A.     Quorum's Goodwill Was Impaired As of the Date of the Spin-Off

126.     Quorum's goodwill was allocated by and from CHS in connection with the spin-off that was effective as of April 29, 2016. Goodwill was initially determined for Quorum's hospital operations. It was allocated based on a relative fair value approach as of September 30, 2013, which was CHS's goodwill impairment date.  It was premised on CHS's stock price as of September 30, 2013, which was $41.50.  Approximately 10% of the goodwill that was on CHS's books was allocated to Quorum.

127.     The last time CHS had performed an evaluation of impairment was September 30, 2015, at which time CHS stock price was still $42.77. Between October 1, 2015, and June 30, 2016, neither CHS nor Quorum had performed an evaluation of impairment.  It is clear that an evaluation should have been prepared at least by the end of the first quarter of 2016.

128.     As discussed above, there were clearly multiple indicators of impairment that management knew about prior to the spin-off of Quorum on April 29, 2016 and the filing of its Form 10-Q for the first quarter of 2016 on May 11, 2016.

129.     First, there was a severe and steady decline in CHS's stock price and financial performance from June 26, 2015 through the spin-off of Quorum.  Because Quorum's goodwill was merely a portion of CHS's goodwill, these indications of impairment applied equally to Quorum (if not more so, since the Quorum hospitals were the "dogs" of CHS). As Defendants stated in the "Information Statement" concerning the Quorum spin-off filed with the SEC on December 4, 2015 on Form 10, "**The determination of fair value in step one of our goodwill impairment analysis is based on an estimate of fair value for each reporting unit** utilizing known and estimated inputs at the evaluation date. The first listed input was "**the most recent price of CHS' common stock[.]**"

130.     CHS stock price on June 26, 2015 closed at $64.04.  CHS stock price on May 3, 2016 closed at $14.87, a staggering **decline of $49.17 – or 76.8%**.  This corresponded to a **decline of approximately $5.6 billion in market capitalization**. This decline was well established prior to the end of 1Q 2016. CHS's average stock price from February 16, 2016 through May 11, 2016 was $17.08.

131.     Compounding the problem, the Quorum hospitals were in even worse shape than the hospitals of CHS as a whole, and as a result Quorum's stock price continued the steep slide after the spin-off.

132.     Between April 29, 2016 and May 11, 2016 , Quorum's stock price dropped from $13.05 per share to $9.93 per share, a drop of approximately 26%.  The only day that its stock price increased in that time frame was on May 10, 2016.  Quorum's market capitalization also

37

decreased $105.2 million during the same period, from $397.9 million on April 29, 2016 ($13.5 price per share x 29,475,039 shares outstanding) to $292.6 million on May 11, 2016 ($9.93 price per share x 29,475,039 shares outstanding) a decline of 26%.

133.    Quorum's and CHS's large combined market capitalization decline of approximately $5.7 billion was a key indicator that its goodwill was likely impaired.  This was a key indicator that the fair value of Quorum's reporting unit was more likely than not below its carrying amount.  The decrease in stock price was simply reflecting the public's expectation that there was going to be lower cash flows and earnings being generated from Quorum's hospitals in the future.

134.    The Office of the Chief Accountant for the SEC has explained the significance of recent stock price declines in the goodwill analysis:

> [I]t would not be reasonable for a registrant to simply ignore recent declines in their stock price, as the declines are likely indicative of factors the registrant should consider in their determination of fair value, such as a more than temporary repricing of the risk inherent in any company's equity that results in a higher required rate of return or a decline in the market's estimated future cash flows of the company.[6]

135.    GAAP does not specify how long a period of time the stock price must decline before that period is characterized as a "sustained." However, publicly traded companies have regularly interpreted "sustained" to be a period fewer than the combined 320-day "sustained" decline CHS and Quorum experienced. For example:

- Sientra, Inc. cited "a significant decline in its common stock price" as one indicator of goodwill impairment for its quarter ended September 30, 2015. The "sustained" decline comprised 7 days, from September 24, 2015 to September 30, 2015. (Notably, Sientra

---

[6] Robert G. Fox III, Professional Accounting Fellow, Office of the Chief Accountant, U.S. Securities and Exchange Commission, Speech by SEC Staff: Remarks before the 2008 AICPA National Conference on Current SEC and PCAOB Developments, Washington, D.C. (Dec. 8, 2008), available at https://www.sec.gov/news/speech/2008/spch120808rgf.htm.

38

still proceeded to step one of the goodwill impairment test even though the $10.15 stock price on September 30, 2015 exceeded the $9.63 book value of equity by 5.4%.)[7]

- Supervalu Inc. cited a "significant and sustained decline in the Company's market capitalization [*e.g.*, stock price multiplied by shares outstanding] and updated discounted cash flows" as indicators of goodwill impairment for is quarter ended December 3, 2011. The "sustained" decline comprised 10 days, from November 23, 2011 to December 2, 2011. (Notably, Supervalu still proceeded to steps one and two of the goodwill impairment test even though the $7.29 stock price on December 2, 2011 exceeded the $7.07 book value of equity.)[8]

- Ciber Inc. cited "a sustained decrease in the stock price and lower than expected earnings" as indicators of goodwill impairment for the quarter ended March 31, 2016. The "sustained" decline comprised 43 days, from February 18, 2016 through March 31, 2016. (Ciber proceeded to perform steps one and two of the goodwill impairment test.)[9]

- Marchex Inc. cited "a sustained decline in the Company's common stock share price and market capitalization as well as lower projected revenue growth rates and profitability levels compared to historical results" as indicators of goodwill impairment for the quarter ended June 30, 2016. The "sustained" decline comprised 45 days, from May 17, 2016 through June 30, 2016. (Marchex proceeded to perform steps one and two of the goodwill impairment test.)[10]

- China Techfaith Wireless Communication Technology LTD cited a "significant decline in its stock price for a sustained period" of time as the sole indicator of goodwill impairment for the quarter ended September 30, 2011. The "sustained" decline comprised 46 days, from August 16, 2011 through September 30, 2011. The company proceeded to perform steps one and two of the goodwill impairment test.).[11]

136.    ASC 350-20-35-3C(g) indicates that "a sustained decrease in share price (considere[ed] in both absolute terms and relative to peers" can be a triggering event that requires testing for goodwill impairment.  In fact, when CHS and Quorum belatedly reported in August 2016 that Quorum's and CHS's goodwill was impaired as of the end of 2Q 2016 each

---

[7] Sientra, Inc. Form 10-Q for the period ended September 30, 2015, filed November 16, 2015, at 1, 8, 9, 19 and 36.

[8] Supervalu Inc. Form 10-Q for the period ended December 3, 2011, filed January 12, 2012, at 5, 9, 17, 18, 21 and 81.

[9] Ciber Inc. Form 10-Q for the period ended March 31, 2016, filed May 10, 2016, at 5, 10, 20, 24, 28 and 37.

[10] Marchex Inc. Form 10-Q for the period ended June 30, 2016, filed August 9, 2016, at 3, 10, 15, 27, 31 and 42.

[11] China Techfaith Wireless Communication Technology LTD Form 20-F for the fiscal year ended December 31, 2011, at 3-5 and F-36.

39

company itself ascribed the decline in share price and market capitalization as being the driving reason for the recording of impairment.

137.    Notably, Quorum's stock price did not decline between May 9, 2016 (the day before Defendants' announced Quorum's first quarter 2016 results) and the belated announcement of the goodwill impairment on August 10, 2016, after the close of trading.  To the contrary, it **increased**.  On May 9, 2016, Quorum's stock price closed at $9.98.  On August 10, 2016, Quorum's stock price closed at $10.02.  Similarly, CHS's stock price declined only 7.8% from $14.09 on May 11 to $12.93 on August 3, 2016.  Thus, the impairment indicators requiring an impairment of goodwill and long-lived assets existed prior to Quorum's spin-off and filing of its Q1 2016 results, not after.

138.    Moreover, there was clearly a decline in the overall financial performance that had a negative effect on future earnings and future cash flows in the hospitals that were spun-off from CHS beginning at least as early as the first quarter of 2016.  As discussed above, there are several examples that make this clear:

139.    CHS's income from operations for 3Q and 4Q 2015 and 1Q 2016 declined by 9%, 157%, and 87%, compared to the same periods the previous year..  Adjusted EBITDA likewise declined 11.9%, 32.9%, and 11.5%, compared to the same periods the previous year. CHS experienced a decline in admissions of 1.9%, 3.6%, and 2.6% compared to the same quarter the previous year, with same-store admissions decreasing 2.1%, 3.4%, and 2.0%. CHS also continually missed consensus estimates.  For 3Q and 4Q 2015 and 1Q 2016, EBITDA missed consensus estimates by 37%, 31% and 10.2%. CHS also consistently missed its guidance, which it continually reduced.  CHS was also greatly underperforming its peers.

- As for Quorum specifically:

- For 2015, Quorum posted a net loss of $9.1 million, compared to net income of $7.8 million in 2014.

- Income from operations for the three months ended March 31, 2016 was $21.1 million, compared with income from operations of $34.3 million in the same period in 2015, a drop of approximately 38%.

- Adjusted EBITDA for 1Q 2016 was $56 million, down $10 million (or 15.2% from $66 million in 1Q 2015.

- In the quarter, Quorum experienced a net loss per share of ($0.08), which excludes $2.8M (aftertax) impact from transaction cost expenses associated with the spin-off. Including the cost, net loss was ($0.18).

- Facilities that Quorum was attempting to divest produced negative adjusted EBITDA of approximately $14.8 million, of which approximately $4.9 million related to the first quarter.

- Overall Net Patient Revenues declined in both volumes and rates due to payor shifting and increases in Medicare Advantage plans. There was also a shifting of inpatient to outpatient settings. The shifting of payor mix created declines in both rate and acuity.

- According to multiple Confidential Witnesses, the hospitals chosen to be part of Quorum were "dogs" that were experiencing a steady decline in business and losing money.

- The performance of Quorum's hospitals was so bad that as of the date of the spin-off Quorum was already looking to offload 8-10 of its hospitals that were already generating negative EBITDA.

    140.    There was also an increase in cost factors:

- There was a shifting of the Parent Company management fees that was charged to Quorum's hospitals for direct corporate office salaries that are now being paid by Quorum directly. CW1 described how there were a lot of expenses that were not incurred by his hospital prior to the spin-off that were part of corporate overhead such as legal fees, capital financing fees and marketing costs.

- There was an increase of TSAs as compared to prior allocations.[12]

- There was an increase in Medical specialists fees relating to ER and hospitalists and contract labor.

---

[12] Earnings Presentation for the Second Quarter of 2016, pg. 5. TSA costs relate to certain transition service agreements that Quorum had with CHS to provide administrative services for information technology, payroll processing, collections, eligibility screening services and revenue cycle management for hospitals and physician practices. The costs of these agreements were running at a $9-$10 million annualized higher cost than the 2015 direct allocations.

141. According to CW1, there was also a deterioration in the environment in which some of the Quorum health hospitals operated with increased competition from larger hospitals. For example, there was a facility in Evanston Wyoming that was a small hospital that had poor relations in its community, and it was dealing with stiff competition. These factors all cut into the hospital's bottom line. The increased competition of this hospital could have rendered it impaired. Rural hospitals were really hurting. The smaller hospitals were not as profitable as the larger ones that remained with CHS and they also did not grow as fast.

142. By not delaying the issuance of its Q12016 Form 10-Q and or amending it to record the appropriate impairment charge as of March 31, 2016, Quorum also violated SEC rules and regulations. An SEC Staff Announcement titled Issuance of Financial Statements states the following about subsequent events:

> In considering when financial statements have been issued, the SEC staff observed that Rules 10b-5 and 12b-20 under the Securities and Exchange Act of 1934 and General instruction C(3) to Form 10-K specify that financial statements must not be misleading as of the date they are filed with the Commission. For example, assume that a registrant widely distributes its financial statements but, before filing them with the Commission, the registrant or its auditor becomes aware of an event or transaction that existed at the date of the financial statements that causes those financial statements to be materially misleading. If a registrant does not amend those financial statements so that they are free of material misstatement or omissions when they are filed with the Commission, the registrant will be knowingly filing a false and misleading document.[13]

143. Defendants were required to consider subsequent events that occurred after March 31, 2016, but before the issuance of Quorum's Q1 2016 Form 10-Q on May 11, 2016. ASC 855-10-25-1 required Quorum to "recognize in the financial statements the effects of all subsequent events that provide additional evidence about conditions that existed at the date of the balance sheet, including the estimates inherent in the process of preparing financial statements." The

---

[13] SEC Staff Announcement S99-2.

poor financial results and the stock price decline arose from and related directly to the March 31, 2016 financial statements.

144.    Had the Defendants tested goodwill for impairment before the issuance of the first quarter 2016 financial statements they would have learned that the goodwill was impaired at the time it was initially allocated to Quorum from CHS in connection with the spin-off.  There was no reasonable basis to believe that the fair value exceeded carrying amount of goodwill and that the goodwill was supported by sufficient future cash flows.  Quorum would have failed both step one and step two of the goodwill impairment test.  Management should have been in a position to prepare cash flow analysis for the hospitals and had they done this it would have learned that its cash flows going forward were going to be lower in the future.

145.    Management knew that Quorum was going to incur certain stand-alone company costs that it would not have incurred had it still been part of CHS.  When Quorum was part of CHS, costs such as certain salaries, benefits, tax, treasury, audit, risk management, legal, investor relations, human resources and certain service agreements were all paid directly by CHS.  Prior to the spin-off, the 38 hospitals were allocated these costs and in certain cases paid a management fee to CHS.  Because management came from CHS and these were historic costs, Defendants knew that its cash flows for the hospitals were going to be lower going forward because of the normalization of expenses that management failed to consider.[14]

**B.      Quorum's Long-Lived Assets Were Impaired As of the Date of the Spin-Off**

146.    Similar to goodwill impairment, Defendants mislead investors that Quorum's long-lived assets were not impaired at the time of the filing of its first quarter Form 10-Q on May

---

[14] The process of normalizing expenses is when certain adjustments are made to the financial statement for valuation purposes.  Normalization adjustments convert reported GAAP income and expenses to an economic basis that is indicative of future cash flows.

43

11, 2016.  As the result, its 1Q Form 10-Q violated GAAP and SEC regulations and was false and misleading.

147.    The decline in the market value of CHS's and Quorum's market capitalization between June 26, 2015 and May 11, 2016 when Quorum's Q1 2016 Form 10-Q was filed was a qualitative factor indicating that the carrying amount of its long-lived assets may not have been recoverable.  This decline is clearly an "event or change in circumstances" that indicated that the carrying value may not have been recoverable.[15]  The drop in CHS's and Quorum's share price is an indication that Quorum's future cash flows and earnings were going to be negatively affected. Stock ownership represents a portion of a future stream of earnings.  Cash flow based measures can be used as an alternative measure of future earnings.[16]  This factor along with defendant's knowledge of its declining operating results of its hospitals should have caused it to perform impairment testing of its long-lived assets before it filed its first quarter Form 10-Q. Furthermore, management also likely knew that it was going to sell a significant portion of its hospitals before the end of their useful lives which is another indicator of impairment.

148.    Defendants violated GAAP by waiting until Quorum received letters of intent to buy certain hospitals before it made the decision to perform impairment testing on all of its hospitals.  Therefore, the decline of future earnings as admitted to by the Company in its 2Q Form 10-Q is an indicator that its long-lived assets were likely impaired at the time it filed its 1Q Form 10-Q.  GAAP required Quorum to incorporate all reasonable available information such as future operating cash flows and projections of future earnings losses. By not performing a cash flow analysis at the end of 1Q 2016, Defendants failed to comply with ACS 360.

_____

[15] ASC 360-10-35-21
[16] www.investopedia.com/articles/basics/04/100804.asp

149.    As described above, the poor financial results that Quorum's hospital was experiencing had occurred during the first quarter of 2016. The Company disclosed in its second quarter Form 10-Q that it was going to experience a decrease in estimated future earnings. Therefore, had the Company prepared a cash flow analysis at the end of the first quarter, it is clear that the future undiscounted cash flows would have also shown declines. The same adverse factors that went into its calculation of its undiscounted cash flows during the second quarter of 2016 existed at the end of the first quarter or 2016.

150.    Had the Company complied with ASC 360, the amount of the write-down of its fixed assets at the end of the second quarter would have been similar to the impairment charge been recorded at the end of the first quarter because the facts and that existed at 2Q 2016 were basically the same as those at the end of 1Q 2016. Defendants knew or should have known that they were going to incur future losses associated with the use of its hospitals before the filing of its 1Q 2016 Form 10-Q and therefore should have tested them for impairment before it filed its 1Q 2016 Form 10-Q.

### C.    <u>Additional SEC Violations</u>

151.    By not recording goodwill impairment in a timely manner Quorum violated Section 13(b) 2 of the Securities and Exchange Act of 1934 entitled *Periodical and Other Reports* which states the following with respect to books and records and internal controls:

> Every issuer which has a class of securities registered pursuant to section 12 and every issuer which is required to file reports pursuant to section 15(d) shall:
>
> A. make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> B. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that—
>
> i. transactions are executed in accordance with management's general or

45

specific authorization;

ii. transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements

152.    Quorum also violated Item 303 of SEC Regulation S-K.  Pursuant to Item 303 of Regulation S-K (17 C.F.R. § 229.303) and the SEC related interpretive releases thereto whereby issuers are required to disclose events or uncertainties, including any known trends, that have had or are reasonably likely to cause  the registrant's  financial information not be indicative of future operating results.

153.    By not recording goodwill impairment on a timely basis, Quorum's assets  were materially overstated in its first quarter 2016 financial statements, which materially understated its true expenses and materially overstated its profits.   The adverse events and uncertainties associated with these declining trends were reasonably likely to have a material impact on Quorum's profitability and future liquidity, and, therefore required to be disclosed in the first quarter 2016 Form 10-Q that was filed with the SEC.

## VIII.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

154.    On April 1, 2016, a Form 10, signed by Miller, was filed with the SEC in connection with CHS's spin-off of Quorum.  A letter to CHS stockholders on CHS letterhead from Smith preceded the Information Statement, stating "I am pleased to provide you with the enclosed Information Statement relating to the spin-off by Community Health Systems, Inc. ("CHS")."  Smith's letter concluded, "The enclosed Information Statement, which is being made available to all CHS' stockholders, describes the spin-off in detail and contains important information about QHC, including historical combined financial statements. We urge you to read the Information Statement carefully. I want to thank you for your continued support of CHS and we look forward to your support of both companies in the future."  The Information Statement

46

stated the Company's assets included $876 million in property plant and equipment and $541.7 million in goodwill. Quorum attributed $508.4 million of that value to its hospital operations reporting unit.

155. The foregoing representations in ¶ 154 were materially false and/or misleading because Quorum's goodwill was impaired by $205 million and its long-lived assets were impaired by $45.4 million. By not recording goodwill impairment on a timely basis, Quorum's assets were materially overstated in its first quarter 2016 financial statements, which materially understated its true expenses and materially overstated its profits.

156. On May 11, 2016, Quorum issued a press release and also filed a Quarterly Report on Form 10-Q with the SEC, signed by Miller and Culotta, reporting in full the Company's financial and operating results for the quarter ended March 31, 2016. Quorum repeated its claim that its total assets exceeded $2.3 billion, including $541.8 million in goodwill. In its Q1 2016 10-Q, Quorum stated, in part:

> Goodwill is evaluated for impairment at the same time every year and when an event occurs or circumstances change that, more likely than not, reduce the fair value of the reporting unit below its carrying value. There is a two-step method for determining goodwill impairment. Step one is to compare the fair value of the reporting unit with the unit's carrying amount, including goodwill. If this test indicates the fair value is less than the carrying value, then step two is required to compare the implied fair value of the reporting unit's goodwill with the carrying value of the reporting unit's goodwill. The Company performed its last annual goodwill evaluation during the fourth quarter of 2015. No impairment was indicated by this evaluation. The next annual goodwill evaluation will be performed during the fourth quarter of 2016.

157. The Q1 2016 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by the Individual Defendants, stating that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

158.     The foregoing representations in ¶¶ 156-157 were materially false and/or misleading because (i) there were indicators of impairment prior to the spin-off of Quorum and impairment testing should have been conducted; (ii) Quorum's goodwill was impaired by $205 million, (iii)  its long-lived assets were impaired by $45.4 million (iv) by not recording goodwill impairment on a timely basis, Quorum's assets  were materially overstated in its first quarter 2016 financial statements, which materially understated its true expenses and materially overstated its profits; and (v) Quorum's lacked adequate internal controls concerning impairment evaluations.

## IX.     THE TRUTH EMERGES

159.     On August 10, 2016, after the market closed, Quorum filed its Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the three months ended June 30, 2016.  Quorum reported a substantial net loss and an operating loss for the quarter, which it blamed on $250.4 million in impairment charges taken in the quarter. The charges included $45.4 million to reduce certain long-lived asset values in property, equipment and software; $5 million in goodwill based on management's decision to divest certain hospitals; and $200 million related to the carryover allocation of goodwill at the time of the spin-off from CHS.

160.     As a result of this news, Quorum's share price fell $4.99, or 49.8%, to close at $5.03 on August 11, 2016.

161.     On August 11, 2016, after the market closed, the Company hosted a conference call to discuss its quarterly results.  During the call, Defendant Miller stated, in part:

> This quarter was not at all what we had in mind for our first quarter as a public company . . . .  As you know, we were not set up as a separate entity and thus had no real hands-on with the majority of these facilities and QHR prior to that time. With the facilities from all six divisions of CHS, it's only natural to expect **there was a lack of focus on many of these matters leading up to the spin**.

48

162.    In his prepared statements, Defendant Culotta admitted during the call that Quorum had overstated its goodwill at the time of the spin-off:

> **The former Parent used a stock price of $41.50** at September 30, 2013 and multiplied times the number of shares and then multiplied by 1.25% to give a control premium. They then added the debt less cash. They then took the trailing 12-months adjusted EBITDA of the hospitals to be spun out and gave it a 7.5 multiple; and then compared that value to the other value and it represented about 10%. The 10% was used to allocate goodwill, 10% to QHC and 90% to CHS. **So when you take a look at our market value through our equity both at spin and subsequent to the spin and recent trends, it was apparent that there were indicators of impairment.** All testing calculations we did average to the $200 million amount.

163.    As Defendant Culotta admitted, the reason for the impairment to goodwill was because of Quorum's "market value through our equity" at the time of the spin-off.

164.    While Quorum reduced adjusted EBITDA from $265-$275 million to $175-$200 million, the stated driving reason for this reduction was that operating costs for stand-alone Quorum were higher than originally projected at the time of the spin-off. However, because Quorum was wholly part of CHS prior to the spin-off, Defendants had the actual current and historical information as to the operating costs of each and every one of the hospitals owned by Quorum (all previously owned by CHS). There were no new or unexpected costs associated with operating any of the hospitals. This information was known to Defendants prior to the spin-off.

165.    Any assertion by Defendants that the goodwill charge was a result of poor EBITDA in 2Q 2016 or other problems unique to Quorum post-spin-off or otherwise unknown until after May 2, 2016 is belied by the fact that CHS also took a massive impairment to goodwill of $1.4 billion and to long-lived assets of $200 million. In 2Q 2016, CHS's net revenue $4.590 billion beat consensus $4.541 billion. And while Adjusted EBITDA $563 million missed

consensus by $71.5 million, the miss was lower than any of the misses from the prior three quarters. And CHS also updated its 2015 cash flow range to $1.3 to $1.4 billion from $1.35 to $1.5 billion, a smaller decline than the company made at the end of 1Q 2016.

166.    Indeed, CHS admitted, just like Quorum, that the primary indicator requiring the $1.4 billion impairment to goodwill was the decline in CHS's stock price, stating "Those indicators were **primarily the decline in the Company's market capitalization** and fair value of long-term debt during the three months ended June 30, 2016."

167.    Any assertion by Defendants that the decline in stock price and market capitalization that triggered the impairments for Quorum and CHS occurred in 2Q 2016, is demonstrably false. The significant and steady decline in stock price for both Quorum and CHS occurred exclusively prior to May 11, 2016. CHS's stock price declined from $64.04 on June 26, 2015 to $14.09 on May 10, 2016 (78%), whereas CHS's stock price closed on August 3, 2016 at $ 12.93.  Similarly, Quorum's stock price declined from $13.50 on April 29, 2016 to $9.93 on May 11, 2016, whereas Quorum's stock price closed on August 10, 2016 at $10.02.

168.    Because Quorum and CHS each took massive impairments to goodwill, there can be no claim by Defendants that Quorum's impairment was due to unforeseen factors unique to Quorum in 2Q 2016.  Moreover, because both Quorum and CHS stated that the cause of the impairment was the decline in stock price, and because the stock price decline for each company occurred prior to the 1Q 2016 announcement of results on May 10, 2016, Quorum's impairment should have been taken at that time.

## X.    CLASS ACTION ALLEGATIONS

169.    Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Quorum securities during the Class Period (the "Class"); and were damaged

upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

170.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Quorum securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Quorum or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

171.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

172.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

173.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Quorum;

- whether the Individual Defendants caused Quorum to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Quorum securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

174.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

175.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Quorum securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Quorum securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

176. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

177. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

178. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

179. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC. Rule 10b-5(a) makes it unlawful for any person, directly or indirectly to employ any device, scheme, or artifice to defraud. Rule 10b-5(b) makes it unlawful for any person, directly or indirectly to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Rule 10b-5(c) makes it unlawful for any person, directly or indirectly, to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

53

180.     Plaintiffs assert Section 10(b) and Rule 10b-5(a), (b) and (c) claims against all Defendants.

181.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Quorum securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Quorum securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

182.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Quorum securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Quorum's finances and business prospects.

183.     By virtue of their positions at Quorum, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

184.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Quorum, the Individual Defendants had knowledge of the details of Quorum's internal affairs.

185.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Quorum.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Quorum's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Quorum securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Quorum's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise

acquired Quorum securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

186.    During the Class Period, Quorum securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Quorum securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Quorum securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Quorum securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

187.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

188.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

189.    This action was filed within two years of discovery of Plaintiffss claims and within five years of the purchase on which such claims are based.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

190.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

191.    During the Class Period, the Individual Defendants participated in the operation and management of CHS and Quorum, and conducted and participated, directly and indirectly, in the conduct of CHS's Quorum's business affairs.  Because of their senior positions, they knew the adverse non-public information about CHS's Quorum's false financial statements.

192.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to CHS's Quorum's financial condition and results of operations, and to correct promptly any public statements issued by CHS and Quorum which had become materially false or misleading.

193.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which CHS and Quorum disseminated in the marketplace during the Class Period concerning CHS's and Quorum's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause CHS and Quorum to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of CHS and Quorum within the meaning of Section 20(a) of the Exchange

Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Quorum securities.

194.    Each of the Individual Defendants, therefore, acted as a controlling person of CHS and Quorum.  By reason of their senior management positions and/or being directors of CHS and Quorum, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, CHS and Quorum to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of CHS and Quorum and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

195.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by CHS and Quorum.

## XI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

58

## XII. DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: April 17, 2017

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Michael J. Wernke*
Jeremy A. Lieberman
Michael J. Wernke
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
          mjwernke@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Lead Counsel and Attorneys for Plaintiffs*

**BRAMLETT LAW OFFICES**
Paul Kent Bramlett TN #7387/MS #4291
Robert Preston Bramlett TN #25895
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
Telephone:  (615) 248-2828
Facsimile:  (866) 816-4116
Email: PKNASHLAW@aol.com
          Robert@BramlettLawOffices.com

*Liaison Counsel*

59

**HOLZER & HOLZER, LLC**
Corey D. Holzer
Marshall P. Dees
1200 Ashwood Parkway
Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
Email: cholzer@holzerlaw.com
         mdees@holzerlaw.com

*Attorneys for Plaintiff Aparna Rao*