## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

ZWICK PARTNERS, LP and )
APARNA RAO, )
       )
      **Plaintiffs** )
v. )    **NO. 3:16-cv-2475**
       )    **CHIEF JUDGE CRENSHAW**
QUORUM HEALTH CORP., )
COMMUNITY HEALTH SYSTEMS, )
INC., et al., )
       )
      **Defendants** )

## MEMORANDUM OPINION

Pending before the Court is a Motion of Community Health Systems, Inc., Wayne T. Smith and W. Larry Cash ("CHS Defendants") to Dismiss the Second Amended Complaint (Doc. No. 113). For the reasons stated herein, the CHS Defendants' Motion to Dismiss will be **DENIED**.

Also pending before the Court is a Motion of Quorum Health Corporation, Thomas D. Miller and Michael J. Culotta ("Quorum Defendants") to Dismiss Plaintiffs' Second Amended Complaint (Doc. No. 116). For the reasons stated herein, the Quorum Defendants' Motion to Dismiss will be **DENIED.**

## INTRODUCTION

Plaintiffs Zwick Partners and Aparna Rao, on behalf of themselves and all others similarly situated (the proposed Class), have sued the CHS Defendants and the Quorum Defendants, alleging that they acquired Quorum stock at artificially inflated prices between May 2, 2016, and August 10, 2016 (the proposed Class Period). Community Health Systems, Inc. ("CHS") is the nation's largest operator of general acute-care hospitals. Quorum Health Corporation ("Quorum") is an independent operator and manager of general acute-care hospitals and outpatient services.

Quorum was "spun off" from CHS, as an independent company, in April of 2016. Plaintiffs aver that the prices of Quorum stock were artificially inflated because Defendants made false and misleading statements about the financial status of both CHS and Quorum prior to and right after the spin off. Plaintiffs contend that Defendants failed to test and account for impairments to the goodwill and long-lived assets of CHS and Quorum in a timely manner. The Second Amended Complaint defines "impairment" as the condition that exists when the carrying amount (or book value) of the asset exceeds its implied fair market value. (Doc. No. 92 at ¶ 43). Goodwill is the excess of purchase price over the fair market value of the net assets acquired. It is considered an asset because it reflects future economic benefits. Brasher v. Broadwind Energy, Inc., 2012 WL 1357699 at * 20, n. 9 (N.D. Ill. Apr. 19, 2012). A buyer will purchase a business for more than its fair market value because the purchase price will take into account the amount of money that the business is expected to make in the future. The difference between the fair market value and the purchase price is called "goodwill." Dudley v. Haub, 2013 WL 1845519 at * 3 (D. N.J. Apr. 30, 2013). Long-lived assets include items such as land, buildings, equipment and furniture. In re K-Tell Int'l, Inc. Sec. Litig., 107 F. Supp. 2d 994, 1000 (D. Minn. 2000).

Plaintiffs allege that the goodwill and long-lived assets of Quorum were impaired on the date of the spin-off, but Defendants failed to disclose those impairments. Plaintiffs argue that important indicators existed prior to the spin-off that should have alerted, or did in fact alert, Defendants to test for such impairments. Plaintiffs allege that, by not recording those impairments on a timely basis, Defendants materially overstated the value of Quorum's assets. Plaintiffs assert that the truth was revealed on August 10, 2016, when Quorum announced that it had recognized these impairments.

2

Plaintiffs claim that Defendants violated Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("the Act") and Rule 10(b)-5 promulgated thereunder.

## MOTIONS TO DISMISS

For purposes of a motion to dismiss, the Court must take all of the factual allegations in the complaint as true. Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Id. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Id. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Id. at 1950. A legal conclusion couched as a factual allegation need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient. Fritz v. Charter Township of Comstock, 592 F.3d 718, 722 (6th Cir. 2010).

Because Section 10(b) claims sound in fraud, the pleading strictures of Fed. R. Civ. P. 9(b) apply. Thus, the complaint must specify the statements (or omissions) that the plaintiffs contend were fraudulent, identify the speakers, state where and when the statements were made, and explain why the statements (or omissions) were fraudulent. Indiana State Dist. Council of Laborers and HOD Carriers Pension and Welfare Fund v. Omnicare, Inc., 583 F.3d 935, 942-43 (6th Cir. 2009). Specifically, federal law requires that a securities fraud complaint must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and state with particularity facts giving rise to a strong inference that the defendant acted with the required

3

state of mind.  15 U.S.C. § 78u-4(b). The Court must view the Second Amended Complaint in the light most favorable to Plaintiffs. <u>League of United Latin American Citizens v. Bredesen</u>, 500 F.3d 523, 237 (6th Cir. 2007); <u>Iqbal</u>, 129 S.Ct. at 1949.

## FEDERAL SECURITIES LAW

Federal securities law makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of federal law. 15 U.S.C. § 78j(b). Rule 10b-5, promulgated by the Securities and Exchange Commission ("SEC"), specifies the prohibited acts as follows: (1) employing any device, scheme or artifice to defraud; (2) making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (3) engaging in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person. 17 C.F.R. § 240.10b-5. There are six elements to a securities fraud suit under Section 10(b) of the Act and SEC Rule 10b-5: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. <u>In re Omnicare, Inc. Sec. Litig.</u>, 769 F.3d 455, 469 (6th Cir. 2014).

Federal law also imposes legal responsibilities upon the "controlling person" in a publicly-traded company for violations of the Securities Act by their agents. 15 U.S.C. § 78t and ¶ 77o. To state a claim for control person liability, the plaintiff must, at a minimum, plead facts to establish: (1) a primary securities violation; (2) power to control the specific transaction or activity upon which

4

the primary violation is predicated; and (3) actual participation in the operations of the primary

violator in general. *In re Prison Realty Sec. Litig.*, 117 F.Supp.2d 681, 692 (M.D. Tenn. 2000).

## DISCUSSION

### (A) "Making" a Material Misrepresentation

The CHS Defendants argue that Section 10(b) imposes private civil liability against only the

actual "maker" of a misrepresentation and that they were not the "makers" of the alleged

misrepresentations in this case. They contend that the two misrepresentations alleged in the Second

Amended Complaint were made by Quorum.

For purposes of Rule 10b-5, the "maker" of a statement is a person or entity with ultimate

authority over the statement, including its content and whether and how to communicate it. Sec. and

Exch. Comm'n. v. Agfeed Indus., Inc., 2016 WL 10934942 at * 11 (M.D. Tenn. July 21, 2016)

(citing Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135, 142 (2011)). After Janus,

courts have consistently held that corporate officers who sign a document on behalf of the

corporation "make" the statements in those documents. In re Smith Barney Transfer Agent Litig.,

884 F. Supp. 2d 152, 163-64 (S.D. N.Y. 2012); see also JAC Holding Enter., Inc. v. Atrium Capital

Partners, LLC, 997 F. Supp. 2d 710, 734 (E.D. Mich. 2014);[1] Louisiana Mun. Police Emp. Ret. Sys.

v. KPMG, LLP, 2012 WL 3903335 at * 5 (N.D. Ohio Aug. 13, 2012). The Second Amended

Complaint alleges that Defendants Smith and Cash signed each of CHS' quarterly reports filed on

---

[1]     "Despite the constriction of 'maker' liability after *Janus* to those with 'ultimate authority' over a statement, that liability still may extend to corporate officers who sign a false statement under their responsibility and authority as agents of the corporation." JAC Holding, 997 F. Supp. 2d at 734.

5

Form 10-Q and annual reports filed on Form 10-K from August 2015 through the end of the class period, including the time when Quorum was still a part of CHS. (Doc. No. 92 at ¶¶ 27-28).

The first alleged misrepresentation is part of a Form 10, signed by Defendant Miller (Division President for CHS and, later, Quorum's CEO), dated April 1, 2016, and filed with the SEC. (Doc. No. 92 at ¶¶ 154-55). Quorum was not "spun off" from CHS until April 29, 2016.[2] Thus, the hospitals that would eventually become part of Quorum were still part of CHS when this Form 10 was filed.[3] The Form 10 itself states that "[a]ll of the outstanding shares of Quorum Health Corporation common stock are currently owned by CHS." (Doc. No. 115-9 at 12). The Form 10 is accompanied by a letter on CHS letterhead from CHS' President and CEO, Defendant Smith, and a letter on Quorum letterhead from Quorum's President, Defendant Miller. The Form 10 "Notes to Combined Financial Statements" indicate that the accompanying combined financial statements represent the combined balance sheets of the 38 hospitals that *will be* spun off into Quorum. (Id. at 183). Moreover, the CHS Defendants have acknowledged that prior to the spin-off, Quorum and CHS filed consolidated financial statements with the SEC. (Doc. No. 114 at 4). For purposes of a motion to dismiss, the Court finds that Plaintiffs have sufficiently alleged that the CHS Defendants made the alleged false and misleading statements in the Form 10.

Plaintiffs allege that Defendants also made misrepresentations concerning Quorum's financial and operating results for the first quarter of 2016 in Quorum's May 11, 2016 press release

---

[2] In their brief, the CHS Defendants acknowledge that Quorum was a wholly owned subsidiary of CHS until it was spun off from CHS on April 29, 2016. (Doc. No. 114 at 1).

[3] Quorum also recognizes, in its memorandum, that during the first quarter of 2016, the Quorum hospitals were still owned by CHS and fully integrated into the CHS network. (Doc. No. 117 at 7).

and its Q1 2016 10-Q earnings report. (Doc. No. 92 at ¶¶ 156-57). The Second Amended Complaint alleges that those representations were signed by Defendant Culotta (CHS' Vice President for Investor Relations and, later, Quorum's CFO) and Defendant Miller.

Again, the spin-off of Quorum did not occur until April 29, 2016. During the first quarter of 2016, the hospitals that eventually became Quorum's were still a part of CHS.[4] The 10-Q states: "Throughout the periods covered by the condensed combined financial statements, [Quorum] did not operate as a separate entity and stand-alone financial statements were not historically prepared." (Doc. No. 115-11 at 9). The 10-Q states that the financial statements were derived from the consolidated financial statements and accounting records of CHS. (Id.) For purposes of a motion to dismiss, the Court finds that Plaintiffs have sufficiently alleged that the CHS Defendants made the alleged false and misleading statements in the press release and Q1 2016 10-Q report.

Although courts have found that assisting in creating or drafting a false statement does not subject the drafter to Rule 10b-5 liability[5] (see, e.g., North Port Firefighters' Pension v. Temple-Inland, Inc., 936 F. Supp. 2d 722, 741 (N.D. Tex. 2013)), under the circumstances of this case, Plaintiffs have sufficiently alleged that the CHS Defendants did more than simply assist. As noted, the "maker" of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Quorum was not yet an independent entity, and the financials in these representations came from CHS. Plaintiffs have sufficiently

---

[4]    Both CHS and Quorum admit this fact in the Information Statement related to the spin-off by stating that Quorum was an indirect, wholly-owned subsidiary of CHS until after the spin-off, when it became an independent, publicly traded company. (Doc. No. 115-1 at 25).

[5]    The Supreme Court held that suits against entities that contribute "substantial assistance" to the making of a statement, but do not actually make the statement, may be brought by the SEC, but not by private parties. Janus, 564 U.S. at 143.

7

alleged, for purposes of a motion to dismiss, that the CHS Defendants, either alone or in concert with Quorum, made the ultimate determination of the content of and whether and how to communicate these allegedly false representations.[6]

(B) Alleged False and Misleading Statements

Defendants argue that, regardless of who "made" them, none of the alleged misstatements was false or misleading. They contend that determinations of whether and when goodwill and long-lived assets are impaired are statements of *opinion*, not fact. Determining whether and when to test for impairment is different from disclosing the results of that testing. Plaintiffs claim that the impairment testing conducted by Defendants in 2016 should have been conducted earlier and impairments taken sooner. In other words, the alleged securities violations concern when to test for and when to write down impairments for goodwill and long-lived assets.

A company must review its goodwill on a regular basis to determine if its reported value is impaired (i.e., whether its value has declined). The value of goodwill is impaired when the reported amount of goodwill exceeds its fair value. Dudley, 2013 WL 1845519 at * 3. Goodwill should also be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of that asset. Id. Similarly, accounting for the impairment of long-lived assets requires an annual evaluation of the market value of long-lived assets carried on a corporation's books and appropriate adjustments to the book value in accordance with the market value. In re Global Crossing, Ltd. Sec. Litig., 322 F.Supp.2d 319, 342-43 (S.D. N.Y. 2004). A long-lived asset should also be tested for recoverability whenever events or changes in

---

[6]     Given this holding, the Court will not address Plaintiffs' assertions concerning "scheme liability" at this time.

circumstances indicate that its carrying amount may not be recoverable. Brasher, 2012 WL 1357699 at * 21.

The Supreme Court, in Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 135 S.Ct. 1318, 1325 (2015), distinguished statements of fact from statements of opinion (statement of fact expresses certainty about a thing, whereas statement of opinion does not) in a securities fraud case. It found that a statement of opinion does not constitute an untrue statement of fact simply because it ultimately proves incorrect. Id. at 1321 and 1325. The Court held that an opinion is actionable if the person stating the opinion does not actually hold the stated belief or if the opinion contains a materially false embedded statement of fact. Id. at 1326-27; USM Holdings, Inc. v. Simon, 2017 WL 4005939 at * 4 (E.D. Mich. Sept. 12, 2017). When a plaintiff relies on a theory that a statement of fact contained within an opinion statement is misleading, the plaintiff must allege that the supporting fact is untrue. City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 616 (9th Cir. 2017) (citing Omnicare, 135 S.Ct. at 1332). Although Omnicare involved a registration statement that allegedly violated Section 11 of the Securities Act, other courts have found that the same standards for pleading falsity of opinion statements apply to Section 10(b) and Rule 10(b)-5. Id; Sec. and Exch. Comm'n. v. RPM Int'l, Inc., 282 F.Supp. 3d 1, 19, n. 10 (D. D.C. 2017).

An opinion statement may also become actionable if it is paired with a sufficiently material omission that makes the statement misleading. USM Holdings 2017 WL 4005939 at * 4 (citing Omnicare 135 S.Ct. at 1329). Whether a statement is "misleading" depends on the perspective of a reasonable investor. Omnicare, 135 S.Ct. at 1327. In Omnicare, the Court explained that a

9

reasonable investor expects not just that the company believes the opinion, but that "it fairly aligns with the information in the company's possession at the time." Id. at 1329.

Plaintiffs allege that the decisions not to test and write down impairments in Q1 2016 did not reasonably align with the information Defendants had at the time. Plaintiffs argue that Defendants' representations, that there were no goodwill or long-lived assets impairments, were made in the face of overwhelming contrary facts. Plaintiffs allege that there were "triggering events" known to Defendants on or before the date of the spin-off (April 29, 2016).[7] Among other things, Plaintiffs allege that there was a sustained, significant decrease in share prices for both CHS and Quorum; there was a dramatic decline in overall financial performance of CHS and Quorum; there was vivid under-performance of Quorum's hospitals; Quorum hospitals faced increased competition from larger hospitals; there was a deterioration in the entire healthcare industry; and CHS and Quorum both had increased cost factors. (Doc. No. 92 at ¶¶ 5, 45 and 59). Whether these triggering events actually occurred, of course, cannot be determined on this motion to dismiss, because on Defendants' Motion to Dismiss, the Court must and does accept the allegations of the Second Amended Complaint as true.

Plaintiffs cite to statements from "confidential witnesses" concerning financial matters and operational concerns with the spin-off. Defendants argue such witnesses must be discounted. While courts often discount information provided by anonymous sources, plaintiffs may rely on confidential witnesses if they plead facts with sufficient particularity to support the probability that

---

[7]     Plaintiffs do not allege that one "triggering event" standing alone, as argued by Defendants, is sufficient to merit impairment testing. Plaintiffs allege numerous "triggering events" and circumstances which, Plaintiffs contend, should have prompted Defendants to test for these impairments. (Doc. No. 92 at ¶¶ 5-13, 35 and 56-95).

a person in the confidential witness' position would possess the information alleged. Doshi v. Gen. Cable Corp., 823 F.3d 1032, 1037, n. 2 (6th Cir. 2016). Confidential sources cannot be used to merely parrot conclusory allegations contained in the complaint, Jackson v. Halyard Health, Inc., 2018 WL 1621539 at * 9 (S.D. N.Y. March 30, 2018), but confidential witnesses may assist securities fraud plaintiffs so long as they are not vague and conclusory. In re EveryWare Global, Inc. Sec. Litig., 175 F.Supp.3d 837, 952 (S.D. Ohio 2016). The complaint must allege that the confidential witnesses were in a position to establish the basis of personal knowledge of the alleged misconduct and they must establish that the defendants were aware of the misconduct. Id. Even confidential high level executives' statements will be insufficient absent some allegation that the witness communicated with the individual defendants or else that the witness was privy to the individual defendants' knowledge. Glaser v. The9, Ltd., 772 F.Supp.2d 573, 589 (S.D. N.Y. 2011). Courts, however, will credit confidential source allegations, generally, in two situations. The first is when those sources' position and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations. Id. at 590. Second, when independent adequately pled factual allegations corroborate a confidential source's statements, the requirement of a description of the source's job is loosened. Id.

The Second Amended Complaint alleges information from three confidential witnesses. Witness # 1 (¶¶ 98-103) was Vice President of Finance for one of the hospitals that eventually became a part of Quorum. He provides no direct evidence concerning what the individual Defendants knew or how he personally knew about decisions of the Defendants. Witness # 2 (¶¶ 104-109) had a position with Quorum Health Resources, a different company, and alleges no direct connection to the knowledge of the individual Defendants. She offers her own opinions and does

11

not explain how she has personal knowledge of what Defendants knew. Witness # 3 (¶¶ 110-115) also had a position with Quorum Health Resources, a different company, and alleges he was in meetings with the individual Defendants. He states only his own observations and not those of the Defendants. Although these witnesses' statements are corroborated by facts alleged in the Second Amended Complaint , the Court will "discount" these statements.

Despite having a bad year, both CHS and Quorum performed impairment testing for 4Q 2015, based upon information as of September 30, 2015 (Doc. No. 92 at ¶ 40), and found no impairment for goodwill and modest impairment for long-lived assets. Plaintiffs contend that those same financial problems continued and worsened into 1Q 2016 and Defendants should have conducted additional impairment testing then. Defendants argue that they had a reasonable basis to believe that the past performance of CHS, as a whole, would not be indicative of Quorum's future.

Plaintiffs allege that impairing CHS' and Quorum's goodwill before the spin-off would have jeopardized Defendants' ability to fund the spin-off and pay down CHS' debt, so Defendants intentionally delayed taking those impairments. The Second Amended Complaint alleges that, prior to the spin-off, CHS had the second highest debt level among the largest investor-owned hospital companies. Plaintiffs contend that CHS chose to spin-off 38 of its worst hospitals into Quorum in order to improve its performance and generate cash to pay down its huge debt. The allegations of the Second Amended Complaint, which the Court must accept as true, are that CHS caused Quorum to take on $1.2 billion in debt, all of which was paid back to CHS as a "special dividend." Thus, Plaintiffs assert, by fraudulently waiting until after the spin-off to write down the goodwill and long-lived assets of Quorum and CHS, Defendants were able to make Quorum look more appealing to investors and secure more financing for CHS. (Doc. No. 92 at ¶¶ 14, 35, 90-91).

For the purposes of these Motions to Dismiss, Plaintiffs have sufficiently alleged, given the underlying "red flags," that the decisions not to test for impairments and not to take those impairments in 1Q 2016 were fraudulent. Plaintiffs have sufficiently alleged that Defendants' assurances (by their failures to test and take additional impairments) did not "fairly align with the information in [Defendants'] possession at the time," and those allegations state a claim for which relief could be granted. The Court cannot consider Defendants' defenses or asserted counter-facts (other than those in documents considered integral to the Complaint) at this time. It must view the Second Amended Complaint in the light most favorable to the Plaintiffs.

Defendants also argue that the April 1, 2016 statements alleged to be false and/or misleading were made prior to the proposed Class Period and, therefore, they cannot form the basis for this action. Some courts have found that a defendant may not be held liable for pre-class period statements. See, e.g., In re Inv. Tech. Group, Inc. Sec. Litig., 251 F.Supp.3d 596, 610 (S.D. N.Y. 2017); North Port Firefighters, 936 F.Supp.2d at 744; In re Facebook, Inc. IPO Sec. and Derivative Litig., 986 F.Supp.2d 428, 464 (S.D. N.Y. 2013).

Most often, the class period is the same as the period of time during which Defendants' alleged fraud was allegedly alive in the market. Zelman v. JDS Uniphase Corp., 376 F.Supp.2d 956, 966 (N.D. Cal. 2005). Only those plaintiffs who traded in the securities at issue while the fraud could have been affecting those securities' value can possibly state a claim for damages resulting from the fraud. Id. The proposed class period dates function only to define the plaintiff class, not to restrict the universe of relevant or actionable facts in the case. Id. at 970.

Plaintiffs aver that the alleged misstatements were incorporated into Quorum's beginning stock price. The first alleged misrepresentations were made on April 1, 2016, and the proposed class

period begins on May 2, 2016. Plaintiffs have sufficiently alleged that those who purchased Quorum stock during this class period relied upon and were affected by the alleged misrepresentations of April 1. The statements were not so "stale" as to be immaterial and had not been superseded by later events and disclosures. See, e.g., In re Crown American Realty Trust Sec. Litig., 1997 WL 599299 (W.D. Pa. Sept. 15, 1997).[8] As indicated below, Plaintiffs' reliance on those alleged misrepresentations came at the time of purchase.

Plaintiffs assert that, even if the April 1, 2016 statements were not actionable at the time they were made, Defendants had a duty to correct those statements at the start of the Class Period. Defendants have a duty to correct statements that are false at the time they were made, when those defendants learn that their prior statements are untrue. In re Facebook, 986 F.Supp.2d at 464. A duty to disclose may arise when a company makes a statement that it believes is true but later discovers that the statement was untrue or misleading when the statement was made. Coble v. Broadvision, Inc., 2002 WL 31093589 at * 7 (N.D. Cal. Sept. 11, 2002). Given the increasing and continued poor performance of CHS, including Quorum hospitals, in 2015 and into 2016, Plaintiffs have sufficiently alleged that Defendants had a duty to correct their April 1, 2016 statements concerning Quorum.

Defendants argue that Plaintiffs' claims are "fraud by hindsight." It is not true that Plaintiffs' claims are that simple. Plaintiffs are not alleging that merely because Quorum announced impairment charges in August 2016, its assets must have been impaired earlier. Plaintiff have pled specific facts concerning the underlying financial conditions, industry trends, stock prices and other

---

[8]     Plaintiffs allege that there was an efficient market for Defendants' April 1, 2016 statements and, therefore, CHS and Quorum investors digested those statements and those statements were reflected in Quorum's initial stock price. The Court finds these allegations to be sufficient.

"red flags" that sufficiently state a claim that Defendants' statements concerning impairments were false when made, rather than merely erroneous in hindsight.

The Quorum Defendants argue that CHS' past financial performance was irrelevant to Quorum's future. Yet Quorum's hospitals were fully integrated within CHS until the spin-off; Quorum's financials prior to the spin-off were calculated with and as a part of CHS' financials; and Quorum's reported goodwill was calculated as a percentage of CHS' goodwill based on past results and stock prices of CHS. The alleged triggering factors for CHS were also triggering factors for Quorum until April 29, 2016. (See Doc. No. 92, ¶¶ 117-123). In other words, CHS' past included Quorum's past.

Defendants also argue that they cautioned about various risks related to Quorum's business, including the risk of a future impairment to goodwill and long-lived assets. Plaintiffs' allegations, however, are that Defendants knew at the time those cautionary statements were made that the impairments should be made. "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." Sec. and Exchange Comm'n. v. Merchant Capital, LLC, 483 F.3d 747, 769 (11th Cir. 2007); In re Van Der Moolen Holding N.V. Sec. Litig., 405 F.Supp.2d 388, 400 (S.D. N.Y. 2005). For all these reasons, the Court finds that Plaintiffs have sufficiently alleged, for purposes of these Motions to Dismiss, a claim for false and misleading statements.

(C) Scienter

Defendants argue that, even if Plaintiffs have sufficiently alleged false and misleading statements, Plaintiffs have insufficiently alleged "scienter," which is a mental state embracing intent to deceive, manipulate, or defraud. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S.Ct. 2499,

2507 (2007). The plaintiff must state, with particularity, facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b); Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. 1309, 1324 (2011).[9]

The Supreme Court has identified three steps a court must follow when faced with a 12(b)(6) motion in a Section 10(b) action. First, all of the plaintiffs' factual allegations must be accepted as true. Second, the complaint and other sources normally considered by a court when ruling on a 12(b)(6) motion must be considered in their entirety. The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. Third, the court must take into account plausible opposing references when determining whether this is a strong inference of scienter. Frank v. Dana Corp., 646 F.3d 954, 959 (6th Cir. 2011) (citing Tellabs, 551 U.S. at 322-324).

Scienter may also take the form of recklessness. Frank, 646 F.3d at 959. Recklessness is defined as highly unreasonable conduct that is an extreme departure from the standards of ordinary care. Id. While the danger need not be known, it must at least be so obvious that any reasonable person would have known of it. Id. Deliberate recklessness is an extreme departure from the standards of ordinary care that presents a danger of misleading buyers or sellers and is either known to the defendant or is so obvious that the defendant must have been aware of it. Dearborn Heights, 856 F.3d at 619. A plaintiff must sufficiently allege why or how the defendants knew about the alleged danger. Grae v. Corrections Corp. of America, 2017 WL 6442145 at * 20 (M.D. Tenn. Dec. 18, 2017). Plaintiffs have alleged myriad examples of stock price decline, market capitalization

---

[9]     The parties argue about a statement made by Defendant Culotta following the 2Q 2016 disclosure of the impairments. What Culotta meant, in context, is clearly disputed, and the Court cannot resolve the disputes about this statement on these Motions to Dismiss.

decline, and declining financial performance (e.g., Doc. No. 92 at ¶¶ 56, 60-61, 64-65, 75-77, 93-95, 125, 130, 138-39) to indicate that Defendants knew or should have known about this "danger."

Before drawing an inference of recklessness, courts typically require multiple, obvious "red flags," demonstrating an egregious refusal to see the obvious or to investigate the doubtful. Doshi, 823 F.3d at 1039. As noted above, Plaintiffs argue that the Defendants ignored "red flags" that were clearly present during the time in question. The Sixth Circuit has identified a non-exhaustive list of nine factors to be considered regarding scienter: (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making the statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood be someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or their jobs. Id. at 1039-40.

Defendants argue that the Second Amended Complaint fails plausibly to allege that they acted with the specific intent to defraud Quorum's investors. They contend that, even if their decisions violated GAPP,[10] violating GAAP (by failing to impair goodwill and long-lived assets) is insufficient to establish scienter. A failure to follow GAAP, without more, does not establish

---

[10]    GAAP is "General Accepted Accounting Principles," which are guidelines and rules for financial accounting used by the accounting profession in the United States. Dudley, 2013 WL 1845519 at * 2.

17

scienter. <u>Dearborn Heights</u>, 856 F.3d at 621. As noted above, in determining whether the pleaded facts give rise to a strong inference of scienter, a court must also take into account plausible opposing inferences. <u>Telabs</u>, 127 S.Ct. at 2509. The court's role is not to scrutinize each allegation in isolation, but to assess all the allegations holistically. <u>Id</u>. at 2511. The plaintiff must plead facts rendering an inference of scienter more than merely plausible or reasonable; it must be cogent and at least as compelling as any plausible opposing inferences. <u>Doshi</u>, 823 F.3d 1032 at 1039. Federal law does not require a plaintiff to definitively rule out non-fraudulent explanations of a defendant's behavior or even to establish, at the complaint stage, that the scales tip decidedly in favor of finding scienter. Rather, the court must simply consider all possible inferences and decide whether the inference of scienter is at least as strong as any opposing inference. <u>Grae</u>, 2017 WL 6442145 at * 21.

The CHS Defendants allege that, in this case, the more compelling inference from the facts is that Defendants made a good faith, but mistaken, determination that positive factors outweighed the negative ones in Quorum's goodwill valuations.[11] The Quorum Defendants contend that the most plausible inference is that the employees who would become Quorum's new management were unaware of circumstances or events that called into question any audited figures or asset values or raised concerns about impairments. Plaintiffs allege, however, specific indicators of impairment, to include, among other things, deterioration in general economic conditions, limitations on accessing capital, deterioration in the environment in which an entity operates, increased competitive

---

[11]     The CHS Defendants base this argument on facts such as (1) Quorum's impairment test in Q4 2015 revealed no goodwill impairment; (2) Quorum performed better in the first quarter of 2016, based on numerous metrics, than the prior quarter; and (3) Quorum's CEO was "pleased" and "very confident and optimistic" based on those results. (Doc. No. 114 at 17, n.11).

18

environment, cost factors that have a negative effect on earnings and cash flows, overall financial performance, a sustained decrease in share price, a significant decrease in the market price of a long-lived asset, a significant adverse change in the extent or manner in which a long-lived asset is being used or in its physical condition, and a current-period operating or cash flow loss combined with a history of operating or cash flow losses. The inference of scienter is at least as strong as the opposing inferences.[12]

CHS released its Q2 2016 financials on August 3, 2016, and Quorum released its Q2 2016 financials a week later. At that time, both companies reported losses and both companies reported significant impairments to goodwill and long-lived assets. Plaintiffs contend that Defendants knew about the facts that led to taking these impairments much earlier than the second quarter of 2016 and intentionally delayed recording them until after the spin off.

Plaintiffs allege that the impairment charges taken by Quorum in Q2 2016, when it finally tested, total $250.4 million. While not dispositive, courts have noted that the sheer size of a write-down adds to the inference that the defendants must have been aware the problem was brewing. Florida State Bd. of Adm. v. Green Tree Fin. Corp., 270 F.3d 645, 666 (8th Cir. 2001). Plaintiffs also assert that Defendants had a significant *motive* to delay taking the impairments so they could secure $1.2 billion of financing needed for the spin off. Courts may consider motive along with all other allegations in the complaint. Dudley, 2013 WL 1845519 at * 16. Moreover, Plaintiffs contend that

---

[12]    The Second Amended Complaint alleges that Defendants cited declining stock prices and the corresponding decline in market capitalization as reasons for testing for impairments as of June 30, 2016. But CHS stock prices had been steadily declining since June of 2015 (Doc. No. 92 at ¶¶ 8, 57, 63, 67, 71, 75 and 85), so this was not "new" information. Plaintiffs allege that, had Defendants tested for impairment before the issuance of the first quarter 2016 financial statements, they would have seen that the goodwill and long-lived assets were impaired at the time they were initially allocated to Quorum from CHS. (Doc. No. 92 at ¶ 13).

19

Defendants had the *opportunity* to delay because they were the highest-ranking executives in the companies.

Considering all these factors, and construing the Second Amended Complaint in the light most favorable to the Plaintiffs, the Court finds that Plaintiffs have sufficiently alleged scienter for purposes of these Motions to Dismiss.

(D) Reliance

To recover damages under Section 10(b) and Rule 10(b)(5), a plaintiff must prove reliance upon the misrepresentation or omission. Halliburton Co. v. Erica P. John Fund, Inc.,134 S.Ct. 2398, 2402 (2014). The reliance element ensures that there is a proper connection between a defendant's misrepresentation or omission and a plaintiff's injury. Id. at 2407. The Supreme Court has held that a securities fraud plaintiff, in certain circumstances, can satisfy the reliance element by invoking a rebuttable presumption of reliance, rather than proving direct reliance on a misrepresentation. Id. at 2408 (citing Basic v. Levinson, 485 U.S. 224, 246 (1988)). This theory, known as the "fraud-on-the-market" presumption, holds that the market price of shares traded on well-developed markets reflects all publicly available information and, hence, any material misrepresentations. Id. at 2402. To invoke the fraud-on-the-market theory of reliance, a plaintiff must show that (1) the alleged misrepresentation was publicly known; (2) the alleged misrepresentation was material; (3) the stock traded in an efficient market; and (4) the plaintiff traded the stock between the time the misrepresentation (or omission) was made and when the truth was revealed. Id. at 2408; Basic, 485 U.S. at 248, n. 27. The fraud-on-the-market theory assumes that the price of a security reflects all the available information about the value of a company. Bovee v. Coopers & Lybrand, 216 F.R.D. 596, 615 (S.D. Ohio 2003).

20

Here, Plaintiffs have sufficiently pled that the alleged misrepresentation was publicly known, that it was material, that the stock traded in an efficient market, and that Plaintiffs purchased the stock between the time the misrepresentation was made and when the truth was revealed. Plaintiffs allege that they relied on Defendants' materially false and misleading statements concerning the impairments at the time of purchasing their Quorum stock. (Doc. No. 92 at ¶ 186). Plaintiffs have sufficiently alleged the elements of the fraud-on-the-market theory at this stage of the litigation.

Defendants also contend that the information upon which their decisions were based, information Plaintiffs allege should have triggered testing, was publicly known. This assertion is a "truth-on-the-market" defense. Because this argument is intensely fact-specific, it is not appropriate for the Court to consider it on these Motions to Dismiss. In re Omnicom Group, Inc. Sec. Litig., 2006 WL 735937 at * 7 (S.D. N.Y. March 30, 2005). The Court cannot conclude, at this time, that the information known publicly to the investors dispelled the false impressions created by Defendants' alleged misrepresentations. Id. Plaintiffs have sufficiently alleged that they relied, at the time of their purchase, on Defendants' failures to take impairments.

(E) Controlling Persons

Federal law imposes legal responsibilities upon the "controlling person" in a publicly-traded company for violations of the Securities Act by their agents. 15 U.S.C. § 78t and ¶ 77o. The "controlling person" must be an actual participant and in control of the specific activity at issue. Because control person liability is derivative, a plaintiff may hold a defendant liable under this theory only if the defendant controlled an entity that violated the Securities Act. North Port Firefighters' Pension - Local Option Plan v. Fushi Copperweld, Inc., 929 F.Supp.2d 740, 788-89 (M.D. Tenn. 2013). In order to plead control person liability, a plaintiff needs to establish that the

defendant actually participated in the operations of the violator and that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated. Prison Realty Sec. Litig., 117 F.Supp. 2d 681, 692 (M.D. Tenn. 2000).

The Quorum Defendants assert that because Plaintiffs have failed to state a claim for primary liability, there can be no claim for "controlling person" liability. In light of the above rulings, this argument fails. The CHS Defendants argue that Plaintiffs have failed sufficiently to allege that Smith and Cash "controlled" Quorum, the maker of the alleged misstatements. The Court has already found, above, that the CHS Defendants, in concert with the Quorum Defendants, were "makers" of the alleged misrepresentations. For the same reasons, the Second Amended Complaint sufficiently alleges that Smith and Cash exercised at least some control over Quorum's allegedly misrepresented financials, particularly because Quorum was still a part of CHS at the times of the alleged misstatements. Therefore, the Second Amended Complaint sufficiently states a claim for Section 20(a) liability for purposes of these Motions to Dismiss.

## CONCLUSION

An Order will enter denying both Motions to Dismiss.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

22