# EXHIBIT B

| | |
|---|---|
| ZWICK PARTNERS, LP and APARNA RAO, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> QUORUM HEALTH CORPORATION, COMMUNITY HEALTH SYSTEMS, INC., WAYNE T. SMITH, W. LARRY CASH, THOMAS D. MILLER, and MICHAEL J. CULOTTA, <br><br> Defendants. | **Case No. 3:16-cv-02475** |

DECLARATION OF SUSANNE TRIMBATH, MBA, PH.D.

1. I have personal knowledge of the matters stated herein and, if called upon, I could and would competently testify thereto.

2. I currently hold a Ph.D. in Economics from New York University with field qualifications in Economic Analysis of Law and International Trade and Finance. I have a Bachelor of Arts degree in business from California State University East Bay and an MBA degree from Golden Gate University. I was formerly the Senior Research Economist at the Milken Institute in the Capitol Studies Group. I am currently the Chief Executive Manager and Chief Economist of STP Advisory Services, where I perform independent research and consulting in Economics and Finance. I am also currently Business Instructor at Cochise College (Arizona) where I teach economics, and quantitative methodology. I serve unpaid positions as Senior Advisor for IO Sustainability, LLC and Contributing Editor at NewGeography.com.

3. I have personal knowledge of securities trade clearing and settlement practices and programs that take place through clearing agencies located in the United States based on my former employment at such agencies, including my experience as Director of Transfer Agent Services at the Depository Trust Company ("DTC"), now a subsidiary of the Depository Trust and Clearing Corporation ("DTCC"), and as Operations Analyst at the Pacific Clearing Corporation ("PCC") and Vault Manager at the Pacific Securities Depository Trust Company ("PSDTC"). I also acquired personal knowledge of securities trade clearing and settlement based on projects completed with the Philadelphia Securities Depository Trust Company, Midwest Securities Depository Trust Company, the International Securities Clearing Corporation ("ISCC") and another one of DTCC's subsidiaries, the National Securities Clearing Corporation ("NSCC"). Today, DTCC is the only centralized clearing and settlement organization in the United States. In 2019, DTCC settled a daily average of 106.5 million securities transactions

with a daily average value of $1.2 trillion (DTCC's 2019 Annual Report, available at www.dtcc.com).

4. After leaving DTC, I expanded my experience and knowledge to include international post-trade processing. I served as Senior Advisor on a US foreign-aid funded project to build institutions like DTC and NSCC in Russia. In my capacity as team-leader in St. Petersburg, I also assisted in the development of brokerage and corporate trust industry participants. During this engagement, as employee to KPMG, I provided consultations to US-based and overseas personnel for similar capital markets projects in Romania, Egypt and Poland. I continued advancing my knowledge of international trade clearing and settlement through the decades that followed. More recently, for example, I was engaged on another US foreign-aid funded project to provide assistance on the development of the All Ukrainian Securities Depository and to further their efforts to develop linkages with DTCC and Euroclear.

5. I am knowledgeable about the DTCC and its subsidiaries' reporting systems, as well as other aspects of securities record-keeping by the DTCC relevant to trade clearing and settlement.

6. Clearing agencies eliminate the physical movement of securities among participants by providing what is known as "book-entry" delivery service, which transfers the ownership of securities electronically. Specifically, the DTC has been in operation since 1975 for the purpose of "immobilizing" securities – either holding security certificates on deposit in its vaults or converting them to book-entry-only for electronic safekeeping.

7. Clearing agencies hold securities deposited by their customers (such as brokers, banks and other clearing agencies) at their facilities. All securities deposited by participants and issuers with DTC are registered in the name of DTC's partnership nominee, Cede & Co.

8. In securities transactions that take place through DTCC, the exchange and transfer of ownership of securities occurs through electronic book-entry delivery. When a participant receives a security distribution under the DTCC system for a beneficial owner, the participant receives a credit for the security on DTCC's records. The ownership interest of the ultimate beneficial owner of the security is in turn recorded on the participant's records. DTCC's records reflect the identity of the participant to whose account the securities are credited. When transactions are not part of the DTCC's CNS system (*i.e.* the transaction does not take place on an exchange), ownership will still be transferred through the DTCC system in the United States, especially for book-entry-only securities (BEO) registered to Cede & Co.

9. DTC settles trades and other securities transactions for its participants. Even if two investors of the same intermediary (*e.g.* a broker), even in the same geographic office location of the intermediary, were to submit buy and sell orders on the same day for the same number of shares in the same security, those trades would still be processed through DTC for fulfillment. Other securities transactions include participant-to-participant deliver orders which may or may not be effected in settlement for any specific trade. The reason for the share movement is generally not known to DTCC.

10. The ordinary process for book-entry-only distributions of any security is for the issuer's agent to process any pending transfers of ownership that would impact ownership records up to the record date established for the distribution. The agent keeps that record date ownership list for the distribution, regardless of ownership changes that might occur for transactions that were not completed by the record date. Then, on the distribution date, the record date owners are credited with the shares/money according to the issuers plan. Shares are initially credited to the owner of record, which includes Cede & Co., the nominee name of the Depository

Trust Company (DTC), the US central depository that holds shares on behalf of its member banks, brokers, clearing agencies, etc. ("Participants"). Later, as stock and/or cash is made available from the issuer's agent, DTC allocates shares and money to its Participants. According to DTC, funds and/or shares must be received by 3:30 pm in order to be allocated to Participants that day in the settlement statements.[1]

11. Those Participants of DTC, in turn, allocate shares and money to the clients for which it acts. In some cases, there might even be a third allocation before the shares reach the beneficial owner if, for example, DTC's member Participant is a clearing agency that holds shares in safekeeping for broker/dealers who have accounts for their own clients/beneficial owners.

12. DTC's distribution processing schedule includes a period of Interim Accounting.[2] For stock distributions, the interim period runs from one day after the record date established by the company through the close of business on the day after the stock begins trading without entitlement to the distribution (commonly known as the "ex-date"). This means that between the time the shares are "Payable" – i.e. when issuer's accounting records are updated to show credits to be allocated to DTC – and the actual allocation of shares, DTC Participants can continue to

---

[1] "As funds are paid to DTC to support cash entitlements, matched funding (i.e., funds received by 3:00 pm and identified at a CUSIP level) is allocated to Participants in batches running approximately every 20 minutes from approximately 8:30 am to 3:30 pm. These allocation totals appear on the DTC Participant Settlement Statement." https://www.dtcc.com/settlement-and-asset-services/corporate-actions-processing/distributions [accessed April 6 2020 9:54 am]

[2] Under DTC's Interim Accounting "During the due bill period, DTC: >Tracks all activity, such as trades, where the receiver is entitled to the announced distribution (cash/stock dividend or interest payment). >Adjusts Participants' record date positions, crediting the receiver and debiting the deliverer". DTC Corporate Actions Service Guide: Distributions, page 28. Accessed: April 6, 2020 [Online: https://www.dtcc.com/~/media/Files/Downloads/legal/service-guides/Service%20Guide%20Distributions.pdf]

adjust the Participants' entitlements from DTC. In some cases where the ex-date is after the record date, a buyer could be entitled to the spin-off distribution if a record-date holder sells the shares with the distribution before the ex-date. Trades that settle after record date "with distribution" (entitling the buyer to the distribution) need a way to adjust the distribution entitlement. Outside DTC, this would create a "due bill" (the distribution is due to the buyer from the seller) that might be settled by payment order, wire or postdated check (for cash distributions) or Deliver Orders (DOs) for share distributions. Inside DTC, however, the process is simplified by Interim Accounting. During the period in which Interim Accounting applies, DTC adjusts participants' record date positions to ensure accurate allocations on the settlement (allocation) dates. (See note 2 above).

13. DTC maintains records of Participant positions in 1.36 million active securities issues eligible for settlement and asset services (DTCC's 2019 Annual Report, available at www.dtcc.com). In the normal course of business, DTC provides details, both via public notices ("Important Notices") and through computerized systems, of transactions in eligible securities such as stock distributions, dividends and reorganizations. Furthermore, the processes and procedures that DTC uses for security transactions are filed with the Securities and Exchange Commission for approval, subject to public comment via the Federal Register and largely available on their website.

14. Attached hereto as Exhibit 1 is a screen shot of the list of events and processing dates for the distribution of Quorum Health Corporation shares in the spin-off from Community Health Systems, Inc. and obtained as non-proprietary informatio. released by DTCC.

15. The table below explains the list of event processing dates established by DTC and shown in Exhibit 1 for the distribution of Quorum Health Corporation shares:

Table 1 Community Health Systems, Inc. Spinoff of Quorum Health Corporation

| Event | Dates | Description |
|---|---|---|
| Payable | 04/29/2016 | Date when issuer's accounting records are updated to show credits to be allocated. |
| Record | 04/22/2016 | Ownership records as of this date are used to establish entitlements to distribution. |
| Ex-Dividend | 05/02/2016 | First day to trade shares of Community Health Systems Inc. without the attached distribution entitlement. |
| Stock Alloc | 05/05/2016 | Date when stock shares will be added ("allocated") to Participant accounts during settlement. |
| Cash Alloc | 05/11/2016 | Date when cash will be added ("allocated") to Participant accounts during settlement. |
| Interim Applies | 04/25/2016 - 05/04/2016 | Dates during which adjustments to previously announced record date positions can be applied at DTC Participant positions, including interim deliver orders (direct delivery of shares from one DTC Participant to another). |

Source: DTCC Security Detail Inquiry - Dividends and Distributions, CUSIP# 203668108, Ticker CYH. Accessed: Mar 27, 2020.

16. Exhibit 1 and the above table show that, while the Quorum shares were "payable" on April 29 to holders of record as of April 22, 1) the record date holdings were subject to change through May 4 and 2) the shares were not distributed (allocated) until May 5. That shares are "payable" merely creates the obligation to pay, it does not effect the actual distribution (of cash or shares). This is demonstrated by two event dates in Exhibit 1 from DTC: the Interim Applies period does not end until May 4 and the allocation of shares was done through end-of-day settlement on May 5. The number of shares due to any Participant was adjustable from before the "Payable" date and the end of the "Interim" period as a result of any additional activity from DTC Participants for their own accounts or those of the beneficial owners for whom the DTC Participant holds shares. It was not until May 5, 2016 – the "allocation date" – that the Quorum shares were actually distributed to DTC's Participants. At some point on or after May 5, 2016, the Quorum shares allocated to the DTC Participants would then be allocated to the

{00369508;2 } - 6 -

beneficial holders. Thus, the earliest date that the beneficial holders could have acquired Quorum shares pursuant to the spin-off was May 5, 2016.

17. Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

DATED: 09 April 2020

_____
SUSANNE TRIMBATH, MBA, Ph. D.

Exhibit 1 to Trimbath Declaration

| Select View | | | | = Required |
|---|---|---|---|---|
| View: | | Select a View | * | |

| Security Summary | | | | |
|---|---|---|---|---|
| CUSIP/CINS # | 203668108 | Ticker | CYH | |
| Exchange | New York Stock Exchange, Inc. | Issuer Name | COMMUNITY HEALTH SYSTEMS, INC. | |
| Cntry/St | DE | Type | Common Stock | |

| Dividends and Distributions | |
|---|---|
| Function | CIL - SPINOFF ELIGIBLE |
| **Dates** | |
| Payable | 04/29/2016 |
| Record | 04/22/2016 |
| Ex-Dividend | 05/02/2016 |
| Stock Alloc | 05/05/2016 |
| Cash Alloc | 05/11/2016 |
| INTERIM APPLIES | 04/25/2016 - 05/04/2016 |
| **Rates** | |
| Stock Rate Whole | 0 |
| Fraction | 0.2500000000 |
| Cash In Lieu Price | 16.74360 |
| Payable In Cusip | 74909E106 |
| **Comments** | |
| Announcement information received from the NYSE. The distribution is one shar | |
| of Quorum Health Corporation Common Stock for every four shares of stock held | |

{00369508;2 }  - 8 -